Katie Mae ANDREWS and Lestine
Rogers, Plaintiffs,

v.

The DREW MUNICIPAL SEPARATE
SCHOOL DISTRICT et al.,
Defendants.

No. GC 73–20–K.

United States District Court,
N. D. Mississippi,
Greenville Division.

July 3, 1973.

Champ T. Terney, Indianola, Miss., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

This civil rights action brought against Drew Municipal Separate School District, its Trustees and Superintendent, seeks declaratory and injunctive relief to redress alleged deprivation of rights and privileges guaranteed by the Fourteenth Amendment to the Constitution, 42 U.S.C. §§ 1981 and 1983, and Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.). Jurisdiction is invoked pursuant to 28 U.S.C. § 1343.

The complaint alleges that plaintiffs, Katie Mae Andrews and Lestine Rogers, both of whom are black females qualified to be employed as teachers' aides in the Drew public schools, were wrongfully denied employment because of a local policy which forbids employment of school personnel who are unwed parents. Plaintiffs contend that this policy or practice, which was promulgated and implemented by defendants, is violative of equal protection because it creates an unconstitutional classification to both race and sex. In addition, plaintiffs urge that the rule impermissibly impinges on their constitutional right to privacy.

Defendants steadfastly defend the reasonableness and necessity of the rule and insist that it applies equally to black and white, male and female.

The parties have presented evidence at extensive hearings [1] and by depositions, and supplied the court with excellent briefs, including those by participating amici,[2] on the legal issues presented.

Charles Victor McTeer, Mound Bayou, Miss., for plaintiffs.

1. Subsequent to the filing of the complaint, plaintiffs moved for a preliminary injunction. An evidentiary hearing was held on March 16, 19 and 20, at the conclusion of which the court took the matter of preliminary relief under advisement, allowing the parties to submit briefs in support of their respective positions. The court, by order dated May 10, 1973, concluded that the issues had been substantially developed to enable to the court to dispose of the case on its merits after affording the parties a final opportunity to submit any additional evidence not previously presented. A final hearing was held on May 31, 1973.

2. Upon the motions of the Center for Constitutional Rights and the Equal Employment Opportunity Commission each was allowed to participate as amicus curiae and submit legal memoranda.

The case is now ripe for final determination on its merits. The relevant facts are disclosed by a brief review of the evidence.

Although the circumstances surrounding the denial of employment to Ms. Andrews and Ms. Rogers arise from different factual settings (Ms. Andrews applied for a position as a teacher's aide and was never hired, while Ms. Rogers, though hired, was subsequently discharged), both plaintiffs were casualties of an unwritten edict issued in May 1972 by Superintendent Pettey to Ms. Fred McCorkle, the director of the teachers' aide program. Pettey had been informed by the Title I coordinator that the school district was employing several teachers' aides who were parents of "illegitimate" children. Disturbed by this report, the superintendent instructed Ms. McCorkle and other administrative personnel that contracts of employees in that category would not be renewed at the end of the current school year (1971–72), and parentage of an illegitimate child would henceforth disqualify prospective applicants from consideration for employment.[3]

When the superintendent's policy became effective in the spring semester of the 1971–72 school year, Ms. Rogers was then employed as a teacher's aide in the elementary school.[4] In August 1971, prior to her employment and in accordance with standard requirements, Ms. Rogers, a high school graduate, had filed an employment application, which was reviewed by Ms. McCorkle. Finding her qualified, Ms. McCorkle recommended the applicant for employment as an aide. Ms. Rogers was granted a year's contract, at a salary of $250 per month. On her employment application, Ms. Rogers had plainly indicated that her marital status was "single" and that she had one child.[5] This disclosure, though known to Ms. McCorkle, did not immediately hinder plaintiff's prospects for continued employment. Upon receiving the superintendent's instructions, however, Ms. McCorkle promptly notified Ms. Rogers and two other teachers' aides suspected of having illegitimate children that they would not be rehired for the succeeding school year.[6]

Ms. Andrews, a college graduate certified to teach school in Mississippi, on December 18, 1972, applied to Ms. McCorkle for employment as a teacher's aide. A vacancy in this position for the ensuing spring semester existed when Ms. Andrews applied. The application which Ms. Andrews filled out in Ms. McCorkle's presence contained inquiries as to the applicant's marital status, to which plaintiff checked "single", and number of children, to which plaintiff responded "0". On the face of the application there was nothing to indicate

---

3. The complaint refers to the policy as precluding the employment of "unwed parents"; and although there was some conflicting testimony as to the scope of the rule as it was interpreted from Pettey's instructions, the evidence indicates that the policy was directed solely to employees who were parents of illegitimate children. The rule would not literally apply to *all* unwed parents (which presumably would include divorced parents, a parent whose spouse is deceased, or a single parent with an adopted child). However, the rule would be nonetheless applicable to a parent who, though presently married, entered matrimony only after begetting an illegitimate child.

4. As of the March 16 hearing, there were 33 teachers' aides employed in the Drew schools. Aides are normally hired on a year-to-year basis. Their primary responsibilities are to assist the elementary school teachers in directing activities in the classroom and supervising school children during recess periods.

5. Unquestionably, plaintiff Rogers had one illegitimate child when she submitted her employment application in August 1971. Since her dismissal, Ms. Rogers has remained unmarried yet has given birth to a second child. Ms. Rogers and her children currently reside with her parents who aid in the care and support of their daughter and grandchildren.

6. Violet Burnett and Rosie Dean Mays, both of whom were also black female teachers' aides, were notified that their contracts would not be renewed because of the policy against unwed parents. Although Violet Burnett appeared as a witness, neither former school employee is a plaintiff in the present action.

that employment of Ms. Andrews would be contrary to the policy. To assure full compliance with Pettey's instructions, Ms. McCorkle routinely "investigated" the parentage status of applicants, in the course of which she learned that Ms. Andrews was the parent of an illegitimate child.[7] Upon receiving this information, Ms. McCorkle wrote on the Andrews' application, "single with a child 3 or 4 [years of age]", and did not further consider her for employment. In January 1973, Ms. McCorkle notified Ms. Andrews that she could not be considered for the position of teacher's aide because she was unwed parent. Ms. McCorkle then recorded a summary of her actions on the reverse side of the application as follows: "This applicant would have been hired in January 1973 if I had not received information from Mrs. Clara Robinson and others at James Elementary that she had a child. The applicant stated on her application that she was single and had no children, when she called by phone in January I informed her of the school policy and have had no contact with this applicant since then." Had Ms. Andrews been employed, her qualifications as a college graduate and holder of a certificate to teach in Mississippi's public schools would entitle her to a contract providing for a monthly salary of $450.

The challenged rule was without question the brainchild of Superintendent Pettey arising from long-held personal convictions concerning morality of school employees; and, should the occasion arise, the rule was not to be limited to teachers' aides or teachers, but equally applicable to any school employee having direct contact with students.[8] Pettey had not discussed the rule with the principals, teachers or school administrative personnel prior to its implementation. Nor had he obtained the prior approval of the Board of Trustees; indeed, the Board was first informed of the rule when the present action was commenced. The evidence shows, however, that the Board has since ratified the policy and the action taken against plaintiffs and other employees pursuant thereto. No white person has been found to be an unwed parent, and denied employment because of the stated policy.

According to Pettey, school personnel should be charged with the responsibility for the moral as well as the intellectual development of the enrolled students. Thus, the rationale of the rule was founded upon a considered opinion that: (1) the bearing of an illegitimate child, no matter when it took place, or under what circumstances, is conclusive proof of the parent's immorality or bad moral character, and therefore is a proper basis for precluding the employment of such persons in an educational environment, the need of a proper teacher model being regarded of especial value to "minority disadvantaged children"; and (2) the employment of a parent of an illegitimate child for instructional purposes materially contributes to the problem of schoolgirl pregnancies. The Drew public schools, which were desegregated by order of this court rendered May 28, 1969, in civil action GC 6731–S, are fully integrated as to faculty, staff and students. Of the total student enrollment of 1200, 80% are black, 20% are white. There were 28 schoolgirl

7. At the hearing, plaintiff Andrews frankly admitted that, though never married, she is the mother of a four-year old child. Plaintiff explained that she was reluctant to disclose this fact on her application because she knew that such a disclosure would preclude her employment under the superintendent's policy. Plaintiff and her child reside in Drew with plaintiff's mother, sister and two brothers.

8. In February 1973 Betty Barnes, a black female who was a college graduate and occasionally employed as a substitute teacher at Hunter Junior High School, was notified by her principal that she could no longer teach because of the superintendent's policy. Ms. Barnes, at time of the hearing, was the unwed parent of a child seven months of age. Pettey testified that his mandate would likewise apply to secretaries, cafeteria workers and librarians; he was not certain as to the rule's applicability to bus drivers, maids, or school janitors.

pregnancies reported in the 1971–72 school year, and 13 in the current year.

Plaintiffs' principal argument is that a rule which classifies parents who are unwed differently from other persons, in the context of requirements imposed for employment in public schools, is violative of the Equal Protection Clause of the Fourteenth Amendment, whether the policy is judged by the traditional rational standard of review or by strict scrutiny required in the case of suspect classifications of sex and race. Another proposition advanced on behalf of plaintiffs is that the bearing of children is a matter of privacy which falls within the penumbra of personal rights protected by the Ninth and Fourteenth Amendments. Defendants deny that the policy, either facially or as applied, creates classifications based on sex or race, and assert that the rule passes constitutional muster as being reasonably related to educational purposes sought to be effectuated by them, and that this is accomplished without trespassing upon any right of privacy recognized by the Constitution.

The case is one of first impression. As indicated by briefs of counsel and from the court's own research, no court has ever been called upon to consider a rule or regulation of the character as the one promulgated for the Drew schools. During our evidentiary hearing, educational and psychological experts have presented differing views, mainly of a judgmental nature unsupported by any studies that provide a solid factual basis for their conclusions. These professional opinions, when simplified, rest either on the notion that an unwed parent is not likely to be a proper example for students, or, on the contrary view, that such parentage has absolutely no relationship to the function and role of teachers or other employees in a public school system.

 This court readily recognizes that public school officials have the undoubted authority to adopt reasonable employee qualification criteria (including the possession of good character traits) applicable to administrators, teachers, staff and public school employees generally. It is also acknowledged that, subject to constitutional and statutory limitations, school officials are to be afforded leeway in imposing employee qualifications to suit the particular needs of the school or school district involved. Certainly, no school administrator or board should be precluded from denying employment to any one determined to be of bad moral character upon a fair and unbiased consideration of pertinent information, and we do not make the slightest intimation otherwise.[8a] Aft-

8a. By Miss.Code § 37–9–59, a school superintendent is empowered to remove or suspend a teacher "for *immoral conduct* or other good cause" after the teacher is given written notice of the charges, and is afforded an opportunity for a public hearing. (Emphasis added).

er a careful review of Drew's policy and the relevant evidence, however, we hold that the policy or practice of barring an otherwise qualified person from being employed, or considered for employment, in the public schools merely because of one's previously having had an illegitimate child has no rational relation to the objectives ostensibly sought to be achieved by the school officials and is fraught with invidious discrimination; thus, it is constitutionally defective under the traditional, and most lenient, standard of equal protection and violative of due process as well. Alternatively, the policy, both inherently and as applied, constitutes an impermissible, discriminatory classification based upon sex. We find it unnecessary to reach the issues of race and privacy raised in argument.

In an unbroken line of decisions, the United States Supreme Court has consistently applied the Equal Protection Clause to strike down statutes, regulations, and rules of a state found to be unconstitutional because of arbitrary and irrational classifications. The traditional standard of review was clearly and succinctly summarized in Rinaldi v. Yeager, 384 U.S. 305, 308–309, 86 S.Ct.

1497, 1499, 16 L.Ed.2d 577, 580 (1966) in these words:

"The Equal Protection Clause requires more of a state law than non-discriminatory application within the class it establishes. * * * It also imposes a requirement of some rationality in the nature of the class singled out. To be sure, the constitutional demand is not a demand that a statute necessarily apply equally to all persons. 'The Constitution does not require things which are different in fact * * * to be treated in law as though they were the same.' * * * Hence, legislation may impose special burdens upon defined classes in order to achieve permissible ends. But the Equal Protection Clause does require that, in defining a class subject to legislation, the distinctions that are drawn have 'some relevance to the purpose for which the classification is made.'"

Only recently, the Supreme Court applying the traditional standard of equal protection review in Reed v. Reed, 404 U.S. 71, 75, 92 S.Ct. 251, 254, 30 L. Ed.2d 225, 229 (1971), invalidated an Idaho statute that preferred a male over a female applicant of the same class in the appointment as administrator of a decedent's estate. Chief Justice Burger, writing for a unanimous court, reaffirmed that:

"A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989, 990 (1920)."

■ It is also a well-settled constitutional principle that a state cannot exclude a person from a profession or occupation in a manner or for reasons that contravene the Due Process Clause or the Equal Protection Clause. Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957). *Schware* may be regarded as a prominent landmark in this field since the case dealt with a state's requirements for admission to practice law, a profession affected with as much, if not more, public interest than teaching school, and one long subject to statutory regulation. In *Schware*, the Court reversed a decision that a bar applicant in New Mexico should not be permitted to take the bar examination in view of his past membership in the Communist Party, his use of aliases and his record of arrests. With respect to the demands of equal protection, the Court held:

"A State can require high standards of qualification, such as good moral character or proficiency in its law, before it admits an applicant to the bar, *but any qualification must have a rational connection with the applicant's fitness or capacity to practice law.*" 353 U.S. at 239, 77 S.Ct. at 756 (Emphasis added).

The Court held that the refusal of the New Mexico Board of Bar Examiners to consider evidence of the applicant's present good character and its reliance solely upon inferences drawn from conduct which occurred many years before violated the Fourteenth Amendment, and was offensive to both equal protection and due process. Justice Frankfurter, concurring, noted that "the judgment here challenged involves the application of a conception like that of 'moral character', which has shadowy rather than precise bounds," and concluded that a "refusal to allow a man to qualify himself for the profession on a wholly arbitrary standard or on a consideration that offends the dictates of reason" contravened the Due Process Clause.[9]

---

9. *Schware* was applied by us in Lipman v. Van Zant, 329 F.Supp. 391 (3-judge, N.D. Miss.1971), to invalidate a one-year durational residency requirement for a bar applicant to take the Mississippi bar examination on the ground that such residency was wholly unrelated to the state's interest in securing a capable and competent bar.

Defendants may gain nothing from the argument that no one has a constitutional right to teach in public schools since that "is only to say that [a person] must comply with reasonable, lawful, and nondiscriminatory terms laid down by the proper authorities." Slochower v. Board of Education of New York, 350 U.S. 551, 555, 76 S.Ct. 637, 639, 100 L.Ed. 692, 699 (1956). "[T]he theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected." Keyishian v. Board of Regents, 385 U.S. 589, 605–606, 87 S.Ct. 675, 685, 17 L.Ed.2d 629, 642 (1967); Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

The unconstitutional vice of the policy, as understood and enforced by Pettey, is that it conclusively presumes the parent's immorality or bad moral character from the single fact of a child born out of wedlock.[10] By the rule, a parent, whether male or female, who has had such a child, would be forever precluded from employment. Thus, no consideration would be given to the subsequent marriage of the parent or to the length of time elapsed since the illegitimate birth, or to a person's reputation for good character in the community. A person could live an impeccable life, yet be barred as unfit for employment for an event, whether the result of indiscretion or not, occurring at any time in the past. But human experience refutes the dogmatic attitude inherent in such a policy against unwed parents. Can it be said

that an engaged woman, who has premarital sex, becomes pregnant, and whose fiance dies or is killed prior to their marriage, is morally depraved for bearing the posthumous child? The rule allows no compassion for the person who has been unwittingly subjected to sexual relations through force, deceptive design or while under the influence of drugs or alcohol, yet chooses to have the child rather than to abort it. The rule makes no distinction between the sexual neophyte and the libertine. In short, the rule leaves no consideration for the multitudinous circumstances under which illegitimate childbirth may occur and which may have little, if any, bearing on the parent's present moral worth. A past biological event like childbirth out of wedlock, even if relevant to the issue, may not be controlling; and that it may be considered more conventional or circumspect for the infant to be surrendered to others for upbringing rather than be reared by the natural parent is hardly determinative of the matter. Furthermore, the policy, if based on moral judgment, has inherent if unintended defects or shortcomings. While obviously aimed at discouraging premarital sex relations, the policy's effect is apt to encourage abortion, which is itself staunchly opposed by some on ethical or moral grounds.[11] It totally ignores, as a disqualification, the occurrence of extramarital sex activity, though thought of by many as a more serious basis for moral culpability.[12] Indeed, the superintendent's fiat, altogether unsupported by sociological data, equates the single fact

---

10. An extract from the superintendent's testimony reads as follows:
"THE COURT: Mr. Pettey, you do not think the facts or circumstances under which an illegitimate birth occurred [are] at all relevant to the issue of good character or bad character?
THE WITNESS: No, sir. That would be hard to get at. I think the fact that the birth occurred without the benefit of matrimony is, to me, proof enough of the—
THE COURT: Is conclusive?
THE WITNESS: Yes, sir.
 \* \* \* \* \*

THE COURT: . . . Suppose a woman had an illegitimate child and then later married either the father of the child or another man. When she presented herself to you she showed she was married and had a child, one child. Would you consider her for employment?
THE WITNESS: No, sir, I would not.

11. See majority opinion by Mr. Justice Blackmun, in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, 166, especially Fn. 22 and 23.

12. Seventh Commandment: Thou shalt not commit adultery. 20 Exodus 14.

of illegitimate birth with irredeemable moral disease.[13] Such a presumption is *not only patently absurd, it is mischievous* and prejudicial, requiring those who administer the policy to "investigate" the parental status of school employees and prospective applicants. Where no stigma may have existed before, such inquisitions by overzealous officialdom can rapidly create it.

■ Granted that many unwed parents may be bereft of morality, and thus unfit for employment in public schools, the policy nonetheless does also bar those persons who, though unwed parents, may have unquestionably good character and high qualifications of job fitness. Since the rule operates arbitrarily and capriciously to prevent certain persons from receiving employment consideration, it constitutes an invidious discrimination and is violative of equal protection. The fact that the two plaintiffs, Ms. Andrews and Ms. Rogers, were either discharged or not considered for employment, without any inquiry whatsoever into their present good moral character but solely because of the stated policy, constitutes a denial of their due process rights.

In Perry v. Grenada Municipal Separate School District, 300 F.Supp. 748 (N.D.Miss.1969), this court applied the foregoing principles to a somewhat analogous case. In *Perry*, the court struck down a school board policy which excluded unwed mothers from admission to high school as violative of equal protection and due process. Judge Orma R. Smith wrote (p. 753): "[T]he fact that a girl has one child out of wedlock does not forever brand her as a scarlet woman undeserving of any chance for rehabilitation or the opportunity for future education."

Although never faced with the precise question of excluding unwed parents as teachers or students in public schools, the Supreme Court, in its recent decision of Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), reiterated in the plainest terms the constitutional impermissibility of using presumptions which offend equal protection and due process. By an Illinois statute, children of unwed parents became wards of the state upon the death of their *mother, thus excluding any right* in the natural father to obtain their custody. The statute conclusively presumed the father of an illegitimate child to be an unfit parent, without affording him opportunity to prove his fitness. The Court held this statute to be violative of both equal protection and due process. Acknowledging that Illinois had a legitimate interest in protecting the moral well-being of a minor child and in strengthening the child's family ties, the Court, speaking through Mr. Justice White, emphasized:

"[W]e are not asked to evaluate the legitimacy of the state *ends,* rather, to determine whether the *means* used to achieve these ends are constitutionally defensible. . . . It may be, as the State insists, that most unmarried fathers are unsuitable and neglectful parents. It may also be that Stanley is such a parent and that his children should be placed in other hands. But all unmarried fathers are not in this category; some are wholly suited to have custody of their children. This much the State readily concedes, and nothing in this record indicates that Stanley is or has been a neglectful father who has not cared for his children. Given the opportunity to make his case, Stanley may have been seen to be deserving of custody of his offspring. Had this been so, the State's statutory policy would have been furthered by leaving custody in him." (405 U.S. at 652, 654, 92 S.Ct. at 1213) (Emphasis added).

■ As a second rationale for their rule, defendants urge that the mere

---

13. In its quest for understanding the court allowed counsel substantial latitude in presenting evidence, as the transcript will show, and rejects a plenitude of material proffered by both sides as irrelevant to the case.

presence of an unwed parent in an educational environment may likely adversely affect the morals of school children and enhance the likelihood of schoolgirl pregnancies. Assuming that libido can be taught in the classroom, there is no evidence that plaintiffs or others were attempting or would have attempted to proselytize students. To the contrary, plaintiffs have never attempted to publicize their parental status. Thus, defendants' reliance on McConnell v. Anderson, 451 F.2d 193 (8 Cir. 1971) is not well placed. In *McConnell,* the Eighth Circuit upheld the University of Minnesota Board of Regents' refusal to employ a self-avowed gay activist whose attempted "marriage" to a fellow homosexual had attracted wide media coverage.

 Defendants express serious concern about the importance of employee role modeling; that is, they assert it is imperative for teachers as well as other school employees to project a "proper" image to students of impressionable age. We are compelled to once again emphasize that the record is devoid of evidence of proselytization. In the absence of overt, positive stimuli to which children can relate, we are convinced that the likelihood of inferred learning that unwed parenthood is necessarily good or praiseworthy, is highly improbable, if not speculative. We are not at all persuaded by defendants' suggestions, quite implausible in our view, that students are apt to seek out knowledge of the personal and private family life-styles of teachers or other adults within a school system (i. e., whether they are divorced, separated, happily married or single, etc.), and, when known, will approve of and seek to emulate them.

 Finally, counsel for defendants urge that, quite apart from any notion of morality, the policy permissibly seeks to regulate a "status" situation, but, if so, "parental status" as a basis of classification is no less offensive to the Fourteenth Amendment than religious or racial status classifications or other groupings arbitrarily and unreasonably made by or on behalf of the state.

An additional, alternative ground of our decision is that, assuming a rational relation does exist between the Drew policy and legitimate educational objectives, the rule creates an inherently suspect classification based on sex, i. e., single women, which cannot survive strict scrutiny mandated by the Fourteenth Amendment.

We note that only unmarried females have been prohibited from employment under the policy; and it is self-evident that the rule can only be applied against them. Although the rule professes to be neutral, proscribing employment of any parent, male or female, of an illegitimate child, the rule cannot operate that way. Unless the man either admits paternity or is so adjudged judicially, it is virtually impossible to prove his involvement. Nature does not readily, if ever, identify the offspring's sire. A woman, however, is impregnated, gives birth, and often raises the child alone. Mr. Pettey freely conceded that mothers of illegitimate children are easier to discover than fathers because, in his words "the unwed mother is stuck with the result." Further, although Ms. McCorkle emphatically stated that she would apply the rule equally to both male and female, when asked how she knew that a certain male teacher's aide had not fathered an illegitimate child, she replied, "because he is married."

Plaintiffs contend that the birth of a child is not an immoral or illicit event, but rather a biological and physiological fact. Thus, the true intent of the rule is, or logically should be, directed to the practice of premarital coitus, of which pregnancy and eventual childbirth is mere evidence. If such be the case and morality is the true issue, plaintiffs contend that the regulation, to be constitutional, must be equally burdensome against male employees who may participate in such "immoral" acts.[14] We must

14. We do not express any view concerning a regulation respecting pregnancy of a classroom teacher during the school term, as such a case is beyond the scope of this opinion.

agree, and under strict review now mandated for sex-based classification, the obvious distinction in the rule's applicability is not constitutionally justified. Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973). In *Frontiero,* a married woman Air Force officer sought coequal housing and medical benefits for her dependent husband under federal statutes which disallowed such benefits to a woman officer who provided less than one-half of her spouse's support. The statutes automatically granted male officers such benefits for their dependent wives without consideration of percentage of support. In holding the statutory scheme constitutionally invalid, because of the special burden imposed upon female officers over males similarly situated, the Supreme Court ruled that "classifications based on sex, like classifications based on race, alienage, or national origin, are inherently suspect, and must therefore be subjected to strict judicial scrutiny." 93 S.Ct. at 1771.[15]

Defendants argue that when a single woman engages in premarital sexual relations, becomes pregnant and begets an illegitimate child, she voluntarily places herself in a classification in which men are not similarly situated, and hence, a regulation which treats such women differently is justified. The rule, however, is directed to parents of illegitimate children, and, save artificial insemination, a male who sires an illegitimate child is equally the partner to the sexual act and is equally the parent of the child, even though the mother may be "stuck with the result." Voluntariness of a classification is certainly not an issue. In *Frontiero,* more burdensome treatment of a married woman officer in the armed services, although it was no doubt her voluntary choice to take connubial vows, was not tolerated.

The essentially discriminatory effect of the Drew policy upon unmarried women is inescapable. Although stated in another context but expository of what we believe to be the truth here controlling are the words of Chief Justice Burger, dissenting in Stanley v. Illinois:

"In almost all cases, the unwed mother is readily identifiable, generally from hospital records, and alternatively by physicians or others attending the child's birth. Unwed fathers, as a class, are not traditionally quite so easy to identify and locate. Many of them either deny all responsibility or exhibit no interest in the child or its welfare; and, of course, many unwed fathers are simply not aware of their parenthood." 405 U.S. at 665, 92 S.Ct. at 1220.

Where a state has adopted a suspect classification like sex, it "bears a heavy burden of justification". McLaughlin v. Florida, 379 U.S. 184, 196, 85 S.Ct. 283, 290, 13 L.Ed.2d 222 (1964). "In order to justify the use of a suspect classification, a state must show that its

---

15. Mr. Justice Brennan, speaking for the Court in *Frontiero,* declared:

"There can be no doubt that our Nation has had a long and unfortunate history of sex discrimination. Traditionally, such discrimination was rationalized by an attitude of 'romantic paternalism' which, in practical effect, put women not on a pedestal, but in a cage.

. . . .

Moreover, since sex, like race and national origin, is an immutable characteristic determined solely by the accident of birth, the imposition of special disabilities upon the members of a particular sex because of their sex would seem to violate 'the basic concept of our system that legal burdens should bear some relationship to individual responsibility . . ..' Weber v. Aetna Casualty & Surety Co., 406 U.S. 164, 175, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972). And what differentiates sex from such nonsuspect statutes as intelligence or physical disability, and aligns it with the recognized suspect criteria, is that the sex characteristic frequently bears no relation to ability to perform or contribute to society. As a result, statutory distinctions between the sexes often have the effect of invidiously relegating the entire class of females to inferior legal status without regard to the actual capabilities of its individual members." 93 S.Ct. at 1769.

purpose or interest is both constitutionally permissible and substantial, and that its use of the classification 'necessary to the accomplishment' of its purpose or the safeguarding of its interest." Sugarman v. Dougall, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973). The defendants in the case sub judice have made no showing whatever that their policy against employing unwed parents serves a compelling state interest or is necessary for the operation of an educational program. Hence, the policy cannot survive strict judicial scrutiny.

Judgment for plaintiffs shall be entered in accordance with this Opinion.