840 F.2d 583
 46 Fair Empl.Prac.Cas. 117,
46 Empl. Prac. Dec. P 37,856
Crystal CHAMBERS, in her own behalf and in behalf of her
minor daughter, Ruth Chambers, Appellant,
v.
The OMAHA GIRLS CLUB, INC., a Nebraska Corporation, et al. Appellees.
 No. 86-1447.
 United States Court of Appeals,
Eighth Circuit.
 Feb. 25, 1988.
 
 1
 Prior report: 834 F.2d 697 (1988).
 
 ORDER DENYING PETITION FOR REHEARING EN BANC
 
 2
 The petition for rehearing en banc has been considered by the court and is denied by reason of the lack of majority of active judges voting to rehear the case en banc.[1]
 
 
 3
 LAY, Chief Judge, with whom HEANEY and McMILLIAN, Circuit Judges, join, dissenting.
 
 
 4
 I dissent from the denial of rehearing en banc. This case presents one of the most important issues we have faced in several years. It is clearly one of "exceptional importance" under Fed.R.App.P. 35(a). Because a majority of the active judges has failed to vote to hear this case en banc, I file this dissent.
 
 
 5
 The Omaha Girls Club's termination of its arts and crafts teacher because of her pregnancy is the most blatant form of sex discrimination that can exist. In my judgment the Girls Club's pregnancy-based discrimination constitutes a per se violation of Title VII of the Civil Rights Act of 1964. See 42 U.S.C. Secs. 2000e(k), 2000e-2(a)(1) (1982). The proffered reasons for the discharge of Crystal Chambers are entirely inconsistent with Congress' avowed intent to "ensure that working women are protected against all forms of employment discrimination" and with its "unmistakabl[e] reaffirm[ation] that sex discrimination includes discrimination based on pregnancy." H.R.Rep. No. 948, 95th Cong., 2d Sess., reprinted in 1978 U.S.Code Cong. & Admin.News 4749, 4751 (emphasis added). The action of the Girls Club is contrary to the letter of the law under the Pregnancy Discrimination Act of 1978 (PDA),[2] the spirit of equal treatment for pregnant women intended by Congress under that Act, and decisions both of this court and of the Supreme Court of the United States.
 
 
 6
 I respectfully submit that the panel has erred in affirming the judgment of the district court. The analysis utilized by the district court was improper in a case of per se sex discrimination. The district court found that Chambers "was fired solely because of her pregnancy," Chambers v. Omaha Girls Club, 629 F.Supp. 925, 946 (D.Neb.1986), but did not discuss the enactment of the PDA in 1978. Even prior to passage of the PDA such a finding was sufficient in this circuit to establish a prima facie violation of Title VII.[3] See Holthaus v. Compton & Sons, Inc., 514 F.2d 651, 653 (8th Cir.1975) ("it is a prima facie violation of Title VII to discharge employees because of pregnancy") (citing EEOC guidelines on employment policies relating to pregnancy, now codified at 29 C.F.R. Sec. 1604.10 (1987)). The district court nevertheless applied the burden of proof method established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), for disparate treatment claims, finding that Chambers had succeeded in identifying herself as a member of a protected group, "a black female." 629 F.Supp. at 947 (emphasis added).
 
 
 7
 The district court found that the Girls Club had articulated a neutral reason for its rule barring single pregnant workers: to provide positive role models for the teenagers with whom the Girls Club worked. The court then shifted the burden back to the plaintiff to show that "the rule was a pretext for discriminating against black women or single black women." Id. (emphasis added). The difficulty I have with this analysis is that when a court finds as a fact, as the district court did, that a plaintiff was fired "solely" because of membership in a protected class, the inquiry should be ended, unless the employer can establish that non-membership in the protected class is a BFOQ. See, e.g., Carney v. Martin Luther Home, Inc., 824 F.2d 643, 648 (8th Cir.1987); Gunther v. Iowa State Men's Reformatory, 612 F.2d 1079, 1086 n. 8 (8th Cir.) (overtly and facially discriminatory employment practice violates Title VII unless there is a BFOQ reasonably necessary to the normal operation of the particular enterprise), cert. denied, 446 U.S. 966, 100 S.Ct. 2942, 64 L.Ed.2d 825 (1980). There can be no issue of pretext--whether an alleged nondiscriminatory reason masks a discriminatory reason--when the employer openly admits the reason for the discharge was solely because of the employee's membership in a protected class. The issue of pretext is not involved. See Carney, 824 F.2d at 648.
 
 
 8
 In Carney, despite the employer's admission that it placed the employee on unpaid leave solely due to a condition arising out of her pregnancy, the district court applied the McDonnell Douglas burden-shifting analysis. The panel stated:
 
 
 9
 [W]e find that the district court erred in applying the McDonnell Douglas test under these circumstances. See TWA, Inc. v. Thurston, 469 U.S. 111, 121-22 [105 S.Ct. 613, 621-22, 83 L.Ed.2d 523] (1985). Our reading of the statute is consistent with the EEOC Guidelines which state:
 
 
 10
 A written or unwritten employment policy or practice which excludes from employment applicants or employees because of pregnancy, childbirth or related medical conditions is in prima facie violation of Title VII.
 
 
 11
 29 C.F.R. Sec. 1604.10(a). The Home admits its decision was based on the condition that plaintiff not lift or push without assistance, a condition directly arising from her pregnancy.
 
 
 12
 Id. A district court's failure to apply the proper burden of proof in employment discrimination cases can vitally affect its factfinding and legal conclusions, as it did here. To overlook this failure simply because this court perceives that the district court's findings support the same result under the proper test is error in itself. With all due respect, when this occurs we mistakenly substitute our judgment for that of the district court and attempt to make such judgment under standards the district court did not even consider.
 
 
 13
 In its discussion of Chambers's disparate impact claim, the district court stated that because the Girls Club "met [its] burden on the basis of business necessity, it [was] not necessary to determine whether the evidence would satisfy a bfoq, although presumably it would." 629 F.Supp. at 951 n. 51. Nonetheless the panel decides, based on the district court's findings with respect to the business necessity defense, that a BFOQ was shown. The Girls Club raised the business necessity defense to Chambers's race discrimination claim, however, which was based on the disparate impact of the Girls Club role model rule on blacks.[4] I respectfully submit that a business necessity defense to a race-based disparate impact claim is simply not equivalent to a BFOQ defense to a sex-based disparate treatment claim; the factual findings relevant to one defense are not necessarily relevant to or sufficient to sustain the other defense.
 
 
 14
 I also respectfully submit that there are fundamental differences between the business necessity and the BFOQ defenses. The defenses are distinguishable, they are to be utilized under different circumstances, and can dictate totally different results in Title VII cases. See generally, Wald, Judicial Construction of the 1978 Pregnancy Discrimination Amendment to Title VII: Ignoring Congressional Intent, 31 Am.U.L.Rev. 591 (1982).
 
 
 15
 First, it is well-settled that the business necessity defense applies in cases in which facially neutral requirements or policies of an employer have a disparate effect on a protected class. See Dothard v. Rawlinson, 433 U.S. 321, 331, 97 S.Ct. 2720, 2727-28, 53 L.Ed.2d 786 (1977); Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). Any rule that explicitly discriminates on the basis of sex, however, must satisfy the statutory requirement that it be a BFOQ "reasonably necessary" to the normal operation of that particular business. 42 U.S.C. Sec. 2000e-2(e).
 
 
 16
 Moreover, the inquiry a court must make when evaluating a BFOQ defense is different from the business necessity inquiry. The BFOQ exception "was in fact meant to be an extremely narrow exception to the general prohibition of discrimination on the basis of sex." Dothard, 433 U.S. at 334, 97 S.Ct. at 2729; see also Wright v. Olin Corp., 697 F.2d 1172, 1185 n. 21 (4th Cir.1982) (business necessity defense is "obviously wider" than narrow BFOQ exception); Harriss v. Pan Am. World Airways, Inc., 649 F.2d 670, 676 (9th Cir.1980) (although related, the two defenses are not identical and must be distinctly applied); Wald, supra, at 597 n. 47.[5] As we pointed out in Carney, the employer seeking to sustain a BFOQ defense must prove, inter alia, "that the job requirements in question [are] 'reasonably necessary' to the essence of the employer's business." Carney, 824 F.2d at 649 (emphasis added). We added:
 
 
 17
 In each case, an objective analysis of plaintiff's actual physical capabilities and the employer's job requirements is necessary, Levin v. Delta Air Lines, Inc., 730 F.2d at 998-99 [5th Cir.1984]; an employer's good faith or subjective beliefs will not save an otherwise discriminatory decision. See EEOC v. Old Dominion Security Corp., 41 F.E.P. Cases 612, 617-68 (E.D.Va.1986).
 
 
 18
 Id.
 
 
 19
 The BFOQ defense in a pregnancy discrimination case thus invokes only an extremely narrow inquiry: (1) what are the requirements of the particular job in question; and (2) is there objective and compelling proof that the excluded woman is unable to perform the duties that constitute the essence of that job because of her pregnancy. Despite the narrowness of the requisite inquiry, however, a more searching examination of the facts and circumstances was essential here before finding that non-pregnancy is a requisite qualification for an arts and crafts counselor.[6] Here, we endorse an employer's subjective beliefs without any proof whatsoever that Chambers was unable to satisfactorily perform her duties as an arts and crafts instructor.[7] In my view this holding is a significant departure from both the letter and the spirit of the PDA.
 
 
 20
 The PDA and its legislative history contain numerous indications that Congress intended pregnancy to be a relevant consideration in an employer's decision to fire a worker only when the pregnancy affects the woman's physical capabilities such that the employer would fire anyone who was similarly physically affected. The language of the PDA itself suggests that Congress so intended:
 
 
 21
 The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work * * *.
 
 
 22
 42 U.S.C. Sec. 2000e(k) (1982) (emphasis added). Its use of the terms "related medical conditions" and "affected by" suggests that Congress thought of pregnancy as a physical condition that, like gender, is unrelated to job capabilities except in the narrowest of circumstances.
 
 
 23
 Moreover, by requiring employers to treat pregnant employees the same as other employees "not so affected but similar in their ability or inability to work," Congress must have been referring to physical ability to work; there is no other ability-to-work basis on which all pregnant women as a class can be compared to all non-pregnant persons. Congress clearly stated that pregnant women must be treated the same as those similarly situated, which presupposes that there are other workers who are in some sense similarly situated. Yet by treating pregnancy as a distasteful component of a negative "role model" rather than as a physical condition that may or may not affect one's ability to work, the employer here has relegated pregnant women to a class by themselves, incapable of being "similarly situated" to anyone. Such segregation is exactly the type of invidious discrimination that Congress intended to eradicate when it enacted the PDA.[8]
 
 As one commentator has stated:
 
 24
 "[A]ccidents of the body," such as one's female sex and thus one's capacity to become pregnant, are not to be criteria for differentiation. Instead all employees, regardless of bodily differences, shall be judged on their ability to perform on the job. That the cause of disability is pregnancy becomes, like one's race or eye color, irrelevant to how one is treated.
 
 
 25
 Note, Sexual Equality Under the Pregnancy Discrimination Act, 83 Colum.L.Rev. 690, 695 (1983) (footnotes omitted). I fear, however, that under the panel's holding, employers' subjective feelings about pregnancy, and therefore about sex, will become permissible considerations in the workplace. Needless to say, this outcome is contrary to previous holdings of this court and of the Supreme Court, and demands scrutiny by the entire court. I therefore dissent from the denial of rehearing en banc.
 
 
 
 [1]
 Circuit Judge C. Arlen Beam did not participate in the vote for rehearing en banc
 
 
 [2]
 The PDA amended Title VII of the Civil Rights Act of 1964 by clarifying that sex discrimination in employment includes discrimination based on pregnancy. See Pub.L. No. 95-555, 92 Stat. 2076 (codified at 42 U.S.C. Sec. 2000e(k) (1982))
 
 
 [3]
 That the Girls Club's "role model" rule operates only against single pregnant women is irrelevant. As the EEOC guidelines state: "It does not seem to us relevant that the rule is not directed against all females, but only against [un]married females, for so long as sex [here, pregnancy] is a factor in the application of the rule, such application involves a discrimination based on sex." 29 C.F.R. Sec. 1604.4(a) (1987)
 
 
 [4]
 The district court found, and the panel affirmed, that the facially neutral rule banning employment of pregnant single women had a disparate impact on blacks, reasoning that more black women would be affected by the rule because of the higher "fertility rate" among black women. See 629 F.Supp. at 949 and n. 45. I question whether the district court meant what it said. The evidence supporting the finding of disparate impact against black women was simply that more black teenagers in the Omaha area became pregnant than did white teenagers. I respectfully submit that such proof does not demonstrate that black women are more "fertile" than white women
 
 
 [5]
 As the Supreme Court noted in Dothard, the EEOC has consistently adhered to the principle that "the [BFOQ] as to sex should be interpreted narrowly." See Dothard, 433 U.S. at 334 n. 19, 97 S.Ct. at 2729 n. 19 (quoting 29 C.F.R. Sec. 1604.2(a)). The only situation stated in the EEOC's guidelines as one in which sex would be considered a BFOQ is when "it is necessary for the purpose of authenticity or genuineness * * * e.g., an actor or actress." 29 C.F.R. Sec. 1604.2(a)(2) (1987)
 
 
 [6]
 Thus, in the present case the examination should be whether: (1) being a "role model" was part of the essence of an arts and crafts counselor's job; and (2) non-pregnancy was a necessary component of the desired role model. With respect to the latter question, the Fifth Circuit has consistently held in the negative, finding that school districts' bans on employing unwed mothers have no rational relation to the schools' objective of instilling moral values in their students. See Avery v. Homewood City Bd. of Educ., 674 F.2d 337, 341-42 (5th Cir.1982), cert. denied, 461 U.S. 943, 103 S.Ct. 2119, 77 L.Ed.2d 1300 (1983); Andrews v. Drew Mun. School Dist., 507 F.2d 611, 617 (5th Cir.1975), cert. dismissed, 425 U.S. 559, 96 S.Ct. 1752, 48 L.Ed.2d 169 (1976). As the Andrews court stated, "the likelihood of inferred learning that unwed parenthood is necessarily good or praiseworthy, is highly improbable, if not speculative." 507 F.2d at 616 (quoting district court opinion, 371 F.Supp. 27, 35 (N.D.Miss.1973))
 
 
 [7]
 It seems to me an essential issue to be discussed is why non-pregnancy is a reasonably necessary occupational qualification for an arts and crafts instructor, when the statutory requirement is that the qualification be one that is "reasonably necessary to the normal operation of that particular business." 42 U.S.C. Sec. 2000e-2(e). See Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 122, 105 S.Ct. 613, 622, 83 L.Ed.2d 523 (1985) ("the 'particular business' to which the statute refers is the job from which the protected individual is excluded"; interpreting same phrase in Age Discrimination in Employment Act, 29 U.S.C. Sec. 623(f)(1)); see also Lorillard v. Pons, 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978) (substantive provisions of ADEA "were derived in haec verba from Title VII"). Although the Supreme Court has not provided much guidance on Title VII's BFOQ defense, it has consistently examined whether the qualification at issue is inextricably connected to the essence
 of a particular job. See Dothard, 433 U.S. at 335, 97 S.Ct. at 2730 (analyzing whether "[t]he essence of a correctional counselor's job [--] to maintain prison security"--would be undermined by not hiring males exclusively) (emphasis added); cf. Thurston, 469 U.S. at 122, 105 S.Ct. at 622. Here, however, the district court neglected even to discuss the particular functions of an arts and crafts counselor at the Girls Club. It is inconceivable that the district court could have determined whether the "excluded class [single pregnant women] is unable to perform the duties that constitute the essence of the job" when it failed to consider what those duties were. Hayes v. Shelby Memorial Hosp., 726 F.2d 1543, 1549 (11th Cir.1984); cf. EEOC v. City of St. Paul, 671 F.2d 1162, 1165-66 (8th Cir.1982) (analysis of BFOQ defense to ADEA claim requires examination of specific duties performed by individual employee to determine whether age is a BFOQ).
 
 
 [8]
 Many statements made in the congressional reports and during debates on the PDA also suggest that only physical capabilities and job requirements should be considered when deciding whether non-pregnancy is a BFOQ. See, e.g., H.R.Rep. No. 948, 95th Cong., 2d Sess., reprinted in 1978 U.S.Code Cong. & Admin.News 4749, 4750 (Committee's view was that EEOC guidelines rightly implemented Title VII's ban on sex discrimination; those "guidelines require employers to treat disabilities caused or contributed to by pregnancy, miscarriage, abortion, childbirth and recovery therefrom as all other temporary disabilities"); id. at 4753 ("The 'same treatment' may include employer practices of transferring workers to lighter assignments, requiring employees to be examined by company doctors or other practices, so long as the requirements and benefits are administered equally for all workers in terms of their actual ability to perform work"); 123 Cong.Rec. 29662 (Sept. 16, 1977) ("Under S. 995, the treatment of pregnant women in covered employment must focus not on their condition alone, but on the actual effects of that condition on their ability to work. Pregnant women who are able to work must be permitted to work on the same conditions as other employees--and when they are not able to work for medical reasons they must be accorded the same rights, leave privileges, and other benefits as other employees who are medically unable to work.") (statement of Sen. Cranston, co-sponsor); id. at 29654 ("We do not want pregnancy discriminated against, as contrasted with a broken leg or a strep throat or appendicitis or some other basis for disability.") (statement of Sen. Javits); id. at 29387 (Sept. 15, 1977) ("The bill requires equal treatment when disability due to pregnancy is compared to other disabling conditions.") (statement of Sen. Javits); id. at 29386 ("The purpose of the bill is to insure that women who are disabled by conditions related to pregnancy are compensated fairly * * * in relation to their fellow employees who are disabled by other medical conditions.") (statement of Sen. Williams, chief sponsor); id. at 29385 ("The key to compliance in every case will be equality of treatment.") (statement of Sen. Williams.)