**Crystal CHAMBERS, Plaintiff,**

v.

**OMAHA GIRLS CLUB, et al.,**
**Defendants.**

**No. CV 83–L–38.**

United States District Court,
D. Nebraska.

Feb. 11, 1986.

Mary Kay Green, Richard J. Bruckner, Omaha, Neb., Edward Diedrich, DeKalb, Ill., Edward Fogarty, Omaha, Neb., for plaintiff.

Boland, Mullin & Walsh, Robert D. Mullin, Jr., A. Stevenson Bogue, McGrath, North, O'Malley & Kratz, Omaha, Neb., for defendants.

BEAM, Chief Judge.

This matter is before the Court for decision after trial to the Court of Title VII claims and trial to a jury of claims brought under 42 U.S.C. § 1981 and 42 U.S.C. § 1985(3).[1] Because the facts and issues of this case are so intertwined the Court originally planned to permit the jury to hear all of the evidence, notwithstanding the fact that only the Court would be deciding the Title VII matters.[2] However, after the plaintiff rested, the defendants moved for a directed verdict which was argued and granted with respect to the claims under 42

---

1. Remedies under Title VII are deemed to be equitable and not within the province of the jury. *See, e.g., Equal Employment Opportunity Comm'n v. Detroit Edison Co.,* 515 F.2d 301, 308 (6th Cir.1975), *vacated on other grounds,* 431 U.S. 951, 97 S.Ct. 2688, 53 L.Ed.2d 267 (1977) (back pay considered form of restitution).

2. At one point in the proceedings (conference in chambers—January 13, 1986) Judge Beam indicated he was considering asking the jury for advisory findings on some of the Title VII issues. Of course, this was not appropriate after the jury was excused part way through the trial.

U.S.C. §§ 1981 and 1985(3). The jury was excused and the Title VII issues were then tried to the Court.

## GENERAL FACTS

In February of 1980, the plaintiff, Crystal Chambers, a twenty-two year old unmarried black female was employed by the defendant, Girls Club of Omaha. The Girls Club is a private, non-profit, tax exempt corporation that serves girls in the Omaha community between the ages of eight and eighteen. The Girls Club has a facility located in North Omaha which serves approximately 1500 members. There is also a Girls Club site in South Omaha which benefits about 500 members. In addition, approximately 1000 young women (non-members) per year make occasional visits to the Girls Club and another 6000 children participate in community wide programs. The membership of the North Omaha Girls Club is approximately ninety percent black and the membership at the South Omaha Girls Club is approximately fifty percent to sixty percent black (testimony Mary Heng-Braun and Exhibit P–38–3). The total number of staff employed by the Girls Club is thirty to thirty-five persons. The non-administrative personnel employed is 100% black at the North Omaha Girls Club and fifty percent to sixty percent black at the South Omaha Girls Club (testimony Mary Heng-Braun).

The Girls Club provides structured educational, vocational, and social programming and a variety of other unstructured opportunities, all designed to help young girls reach their full potential. The Girls Club's stated purpose is to provide behavioral guidance and to promote the health, education, and vocational and character development of girls, regardless of race, creed or national origin (Articles of Incorporation of Girls Club of Omaha, as amended, 1975, Exhibit P–19–3; and By-Laws of Girls Club of Omaha, as amended, 1980, Exhibit P–19–4). Specifically, its mission is to "provide a safe alternative from the streets and to help girls take care of themselves" (testimony Mary Heng-Braun).

Stated another way, the role of the Girls Club is to maximize "life opportunities" for the greatest number of girls (testimony Mary Heng-Braun).

The Girls Club maintains that it is an organization which can be differentiated from schools and other youth programs because of the all girl population it serves, and the high staff to member ratio. In addition, the Girls Club maintains that the extensive contact and the close relationships which often develop between the staff and the members as a result of the open, comfortable atmosphere at the Girls Club differentiates it from schools and other youth programs (one staff person for every ten members physically present at the Girls Club) (testimony Mary Heng-Braun, Bobbie Kerrigan-Rawley and Marta Nieves). Those closely associated with the Girls Club contend that because of the unique nature of the Girls Club's operations, each activity, formal or informal, is premised upon the belief that the girls will or do emulate, at least in part, the behavior of staff personnel. Each staff member is trained and expected to act as a role model and is required, as a matter of policy, to be committed to the Girls Club philosophies so that the messages of the Girls Club can be conveyed with credibility (testimony Eileen Wirth, Mary Heng-Braun).

One such philosophy embraced by the Girls Club is that teenage pregnancy limits life's options for a young woman (see, e.g., testimony Marian Andersen, Dana Bradford, Mary Heng-Braun). The record is replete with evidence that teenage pregnancy is, without a doubt, a major social problem that exists nationally as well as within the Omaha community. It is uncontroverted that the problems associated with teenage pregnancy cut across racial, social and economic lines, but that the number of teenage pregnancies among blacks is presently much higher than among whites (testimony Dr. Harriette Pipes McAdoo and Kenneth Goc). Teenage pregnancy often deprives young women of educational, social and occupational opportunities, creat-

ing serious problems for both the family and society (testimony Dr. McAdoo).

In response to the problems associated with teenage pregnancies and the potential impact upon its members, the Girls Club of Omaha has endeavored to develop and maintain programs aimed at pregnancy prevention. The executive program director of the Girls Club, Marta Nieves, testified that in 1980–1981 the Girls Club of Omaha had seven formal programs that related to pregnancy prevention.[3]

In 1981, in response to the pregnancies of at least two unmarried staff members, a rule was formulated by the Girls Club executive director, Mary Heng-Braun, that single persons who become pregnant or cause a pregnancy would no longer be permitted to continue employment at the Girls Club.[4] Bobbie Kerrigan-Rawley, the Girls Club's deputy director, announced the policy at a staff meeting October 31, 1981. The rule was formally ratified by the Board of Directors on March 15, 1982. This policy was later to be referred to as both rule 11 and the Negative Role Model Policy.[5]

At some point, approximately three months after The Negative Role Model Policy was announced, during an evaluation conference, the plaintiff notified her supervisor, Bobbie Kerrigan-Rawley, that she was pregnant. Thereafter, on February 22, 1982, the plaintiff received a letter from the executive director, Mary Heng-Braun, notifying her that she would be terminated as of April 15, 1982, because of her pregnancy. (Exhibit P–30). Within six days of her termination the plaintiff, with the assistance of Nebraska Equal Opportunity Commission investigator, Timothy Butz,

filed charges of discrimination based upon her sex and marital status with the Nebraska Employment Opportunities Commission (NEOC) and the federal Equal Employment Opportunity Commission (EEOC) (testimony Timothy Butz; Exhibits P–61–1 and P–61–1A). On July 9, 1982, the NEOC held a determination proceeding regarding the plaintiff's charges of discrimination and made a finding that there was no "reasonable cause" to believe that the plaintiff had been discriminated against. The plaintiff made a timely appeal of the NEOC determination to the EEOC in Denver, Colorado, and while the appeal was pending the plaintiff filed this suit in United States District Court for the District of Nebraska in Lincoln, Nebraska.[6]

## PROCEDURAL HISTORY

This action was filed on January 24, 1983, against the NEOC and its officers; the Omaha Girls Club, Inc., its director, deputy director and its officers; the Omaha World-Herald, Harold W. Andersen, Woodson Howe, John Gottschalk, Governor Charles Thone and Attorney General Paul Douglas (first complaint, filing 1). In her first complaint the plaintiff alleged violations of the first,[7] fifth, ninth, and fourteenth amendments of the Constitution of the United States, violations of the Civil Rights Act 42 U.S.C. §§ 1981, 1983, 1985, 1986 and 1988, and pendant state violations including: bad faith discharge, defamation, invasion of privacy, intentional infliction of emotional distress, and conspiracy to deprive her of a right to a livelihood (filing 1). In March of 1983, each defendant filed a motion to dismiss or, in the alternative, a motion for a more definite statement and to

---

**3.** (1) Career Awareness; (2) On Becoming A Young Woman; (3) Cat and Mouse; (4) Health Research; (5) Our Bodies Ourselves; (6) Girl Power; (7) Family Counseling.

**4.** Girls Club of Omaha insists that the rule applied to both sexes from its inception; even though, there was, apparently, no discussion of the application of the rule to male employees on October 31, 1981.

**5.** The rule states "Negative role modeling for Girls Club Members to include such things as

single parent pregnancies." (Girls Club of Omaha Personnel Policy, Exhibit P–20–10.)

**6.** The case was originally filed by Crystal Chambers and her minor daughter, Ruth Chambers. Ruth Chambers was dismissed as a party plaintiff without prejudice, when the Court determined she did not have standing (filing 250).

**7.** On November 15, 1984, plaintiff voluntarily dismissed her freedom of religion claim (filing 136).

strike (filings 21, 22, and 23). The plaintiff responded by filing an amended complaint on May 10, 1983, that was identical to the first complaint (amended complaint, filing 28). The plaintiff further amended her petition by filing a complaint under 42 U.S.C. § 2000e against the Girls Club and its affiliated defendants on August 18, 1983 (filing 41).

On October 20, 1983, Judge Urbom dismissed the NEOC, its officers, Governor Charles Thone, Attorney General Paul Douglas, the claim under 42 U.S.C. § 1983, the pendant state claims of libel, slander, bad faith discharge, intentional infliction of emotional distress and invasion of privacy (filings 52 and 53). The Court specifically found that the NEOC and the Commissioners named in the complaint had absolute immunity (filing 52, at 4). The Court further found that the Girls Club could not be charged under Section 1983 which requires state action as there was no evidence of a sufficiently close nexus between the Girls Club (a private club) and the state, a link which is necessary to treat the Girls Club as an arm of the State; nor did the Court find evidence that the Girls Club was exercising traditional state powers. *Id.* at 3–4, citing, *Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946); *Briscoe v. Bock*, 540 F.2d 392, 395–96 (8th Cir.1976).

Subsequent to the October 20, 1983, order (filings 52 and 53) the plaintiff moved the Court for leave to file a second amended complaint (filing 60). The Court denied leave to file the second amended complaint because the plaintiff had failed to bring the proposed second amended complaint into conformance with the order of October 20, 1983, (plaintiff attempted to again name the NEOC and individual NEOC members as defendants as well as again pleading the dismissed state claims) (filing 65). The plaintiff was directed to file a third amended complaint in conformance with the October 20, 1983, order. *Id.* The plaintiff's

third amended complaint (filing 68) again sought to reinstate parties and claims which had been dismissed on October 20, 1983. The plaintiff was again directed to file an amended complaint which satisfied the Court's earlier orders (filing 90).

On May 17, 1984, a fourth amended complaint was filed naming: The Omaha Girls Club, Inc., Mary Heng-Braun, director; Bobbie Kerrigan-Rawley, deputy director; Mrs. Harold Andersen, Allan Lozier, Clarence Barbee, N.P. Dodge, Jr., Dennis R. Woods, Dana Bradford III, Richard Kizer, Kermit Brashear II, Eileen Wirth, and active members of the Omaha Girls Club Board (filing 97). To the extent parties were not properly named in the fourth amended complaint, they were dismissed as were the claims of conspiracy to commit libel, slander and invasion of privacy (filing 117).[8]

On November 26, 1984, the plaintiff sought the recusal of Judge Urbom (filing 141). That motion was granted on December 31, 1984, (filing 150). The case was transferred to Judge Schatz (filing 150) and, subsequently transferred to Judge Beam (filing 164). In a memorandum opinion dated November 7, 1985, Judge Beam granted summary judgment on the conspiracy issues in favor of the Omaha World Herald, Harold W. Andersen, G. Woodsen Howe and John Gottschalk (filing 197). The Court found that there were insufficient facts to create even an inference that the Omaha World Herald and the associated individual defendants agreed with anyone to deprive the plaintiff of her rights.

The case went to trial on January 6, 1986, almost three years after the first complaint was filed. At the time of trial the issues included: (1) conspiracy to deprive the plaintiff of a federally protected right, 42 U.S.C. § 1985(3); (2) common law conspiracy; (3) intentional racial discrimination, 42 U.S.C. § 1981; (4) sex/pregnancy

---

8. The active members of the Omaha Girls Club Board, not individually named were dismissed (filing 117). Richard Kizer was never properly served process he will be dismissed from this action. *Id.*

Judge Urbom notes in the slip opinion filed July 6, 1984, (filing 117) that the plaintiff failed to amend her fourth complaint to include the amount of wages and insurance benefits as requested by his order of May 7, 1985.

discrimination, (Title VII) 42 U.S.C. §§ 2000 et seq. Pretrial Orders (filings 151, 187, 191 and 192).[9]

As noted above, at the close of the plaintiff's case, the jury was excused and verdict directed in favor of the defendants on the claims under Sections 1981 and 1985(3). In *Craft v. Metromedia*, 766 F.2d 1205, 1218 (8th Cir.1985), the Eighth Circuit set forth the following standard for submitting issues to a jury:

> The standard of review as to the submissibility of (the plaintiffs) case is the same under both federal and Missouri law. *Crues v. KFC Corp.*, 729 F.2d 1145, 1148 (8th Cir.1984). We may find for (the defendants) only if 'all the evidence points one way and is susceptible of no reasonable inferences sustaining the position,' of (the plaintiff). *Id. (quoting Dace v. ACF Industries*, 722 F.2d 374, 375 (8th Cir.1983)) (*quoting Decker-Ruhl Ford Sales v. Ford Motor Credit Co.*, 523 F.2d 833, 836 (8th Cir.1975)). Furthermore, we must resolve direct factual conflicts in favor of (the plaintiff), assume as true all facts in (her) favor which the evidence tends to prove, and give (her) the benefit of all reasonable inferences. We may not find for (defendant) if the evidence so viewed would 'allow reasonable jurors to differ as to the conclusions that could be drawn.' *See Crues*, 729 F.2d at 1148 (*quoting Dace*, 722 F.2d at 375).

*Id.* It was this test which this Court applied before the determination was made to direct a verdict and dismiss the jury.[10]

**9.** Plaintiff's proposed pretrial order indicates that there are also issues of intimidation or intentional infliction of emotional distress. Judge Urbom stated in filing 52 that a cause of action for intentional infliction of emotional distress requires that the defendant "intentionally" have caused the plaintiff mental or emotional distress. He correctly stated that the law requires that a defendant's conduct be "outrageous." Failing to find the necessary conduct, Judge Urbom dismissed this claim over two years ago. Furthermore in the same opinion (filing 52) Judge Urbom indicated that he was not sure if a cause of action exists for intimidation. *Id.* at 8. The defendant, Girls Club of Omaha has represented that it is unable to identify such a cause of action (second revised pretrial order dated October 17, 1985, at 2, filing 187 at 2). And, although the plaintiff continues to assert claims of intimidation and conspiracy to intimidate, she has provided no authority for such a cause(s) of action. In her trial brief, the plaintiff states "with respect to Plaintiff's claims that Defendants intimidated her, the undisputed facts clearly demonstrate that these claims have been proven." Plaintiff's Trial Brief, Section III, at 8. This conclusory statement is the only reference made in her brief to such claim of intimidation and it obviously contains no reference to specific facts, case law, or statutory authority. Absent any finding that such a claim exists in Nebraska, this Court will dismiss the claim for intimidation.

Furthermore, the plaintiff's claims under the first, ninth and fourteenth amendments are not cognizable as independent claims in this case for the reason that in order to find a violation of such constitutional amendments there must be federal or state involvement. Where illegal acts are committed "under color of state law" a remedy is available under 42 U.S.C. § 1983. But, as noted by Judge Urbom, no state involvement exists in this matter. And, although there is no comparable statutory scheme for violations by federal officials, the courts have allowed individuals to redress constitutional violations occasioned by federal officials by authorizing suits to be brought directly on the constitution. *See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 397, 91 S.Ct. 1999, 2005, 29 L.Ed.2d 619 (1971). In the present case no claim may be brought directly under the Constitution because there is no evidence of involvement by any federal official.

**10.** Subsequent to the Court's ruling on the directed verdict, plaintiff's counsel, Mary Kay Green, sought to ameliorate the effect of the Court's action by filing a motion requesting that the Judge recuse himself (filing 255). In her motion, Ms. Green alleged, among other things, (1) that the Judge's wife was an NEOC Commissioner during the investigation (by the NEOC) of (this) case, (2) that the Judge indicated that he would have the jury instruct him even on the Title VII issues, and (3) that the Judge in his private practice had been a personal attorney to Governor Charles Thone, the Governor who appointed all the Commissioners who allegedly held the illegal ex parte hearing at the NEOC at the special request of the defendants and, therefore, that he (the Judge presumably) had (has) an interest in the case. None of these allegations were, in terms of relevancy to this action, accurate (filing 256). And, "reasonable inquiry" by Ms. Green as required by *Fed.R.Civ.P.* 11 would have disclosed such a state of facts. The Court finds that the signature of Mary Kay Green appears to constitute a violation of *Fed.R.*

## RACIAL DISCRIMINATION, 42 U.S.C. § 1981

■ Section 1981 is commonly used to redress racial discrimination in employment.[11] *See, e.g., Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 459, 95 S.Ct. 1716, 1719–20, 44 L.Ed.2d 295 (1975) (aggrieved individual may sue for employment discrimination under 42 U.S.C. § 1981); *Greenwood v. Ross,* 778 F.2d 448, 455 (8th Cir.1985) (retaliatory discharge is cognizable under Section 1981); *see also, Choudhury v. Polytechnic Institute,* 735 F.2d 38, 42 (2d Cir.1984) (retaliatory discharge). Congress imposed within Section 1981, a broad proscription against private racially motivated conduct. *See, Jones v. Alfred H. Mayer,* 392 U.S. 409, 423, 427, 88 S.Ct. 2186, 2194–95, 2197, 20 L.Ed.2d 1189 (1968) (private discrimination in the rental or sale of property prohibited (Section 1982)). Remedies and procedures for employment discrimination under Section 1981 are not co-extensive with the coverage of Title VII; each provides an independent avenue of relief.[12] *Johnson v. Railway Express Agency, Inc.,* 421 U.S. at 460, 95 S.Ct. at 1720. Unlike Title VII, Section 1981 only provides a remedy for employment discrimination where an employment decision is racially motivated; it may not be used to redress sexual discrimination. *De-Graffenreid v. General Motors,* 558 F.2d 480, 486 n. 2 (8th Cir.1977).

In order to make out a case under Section 1981 purposeful or intentional discrimination must be shown.[13] *General Building Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 383 n. 8, 102 S.Ct. 3141, 3146 n. 8, 73 L.Ed.2d 835 (1982), *aff'd, Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 104 S.Ct. 2576, 2590 n. 16, 81 L.Ed.2d 483 (1984); *Washington v. Davis,* 426 U.S. 229, 244–48, 96 S.Ct. 2040, 2050–52, 48 L.Ed.2d 597 (1976). Evidence of adverse or disparate impact alone is not sufficient under Section 1981 to show intentional discrimination. *General Building Contractors Ass'n v. Pennsylvania,* 458 U.S. at n. 8, 102 S.Ct. at n. 8. However, when evidence of disparate impact is combined with other circumstantial evidence

---

Civ.P. 11 and that a hearing should be set at which time Ms. Green shall show cause why the Court should not impose sanctions as contemplated by the rule. A separate order shall be entered contemporaneously with this opinion.

11. 42 U.S.C. § 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

12. There are differences between Section 1981 and the statutory scheme of Title VII. For example, under the specific terms of Title VII: (1) it is inapplicable to certain employees, 42 U.S.C. §§ 2000e(b); (2) assistance in investigation conciliation may be available, Section 2000e–5(b); (3) costs, attorneys fees may be available, Section 2000e–5(k), *Johnson v. Railway Express Agency, Inc.,* 421 U.S. at 460, 95 S.Ct. at 1720; (4) procedures are more complex, Section 2000c–5; (5) no jury, Section 2000e–5(f); *Craft v. Metromedia, Inc.,* 722 F.2d at 1209 n. 3; (6) no compensatory damages for humiliation or

emotional distress, *Muldrew v. Anheuser-Busch, Inc.,* 728 F.2d 989, 992 (8th Cir.1984).

On the other hand, under 42 U.S.C. § 1981 equitable and legal relief, including compensatory and, in some cases, punitive damages may be available. *Johnson v. Railway Express Agency, Inc.,* 421 U.S. at 460, 95 S.Ct. at 1720. The procedural scheme for filing a complaint is less complicated and the period of limitation is less restrictive.

13. Because the source of power for Section 1981 is the fourteenth amendment, proof of intentional discrimination is required just as such a showing is necessary to establish a violation of the equal protection clause. The Supreme Court in *General Building Contractors Ass'n v. Pennsylvania,* 458 U.S. at 382–85, 102 S.Ct. at 3145–47 reviewed the legislative history of both Section 1981 and the fourteenth amendment. The Court noted that the Civil Rights Act of 1866, from which the operative language of Section 1981 evolved, was the "initial blueprint" of the fourteenth amendment, and that the Enforcement Act of 1870 which was passed pursuant to the fourteenth amendment contains the language that now appears in Section 1981. The Court stated that Section 1981 and the Fourteenth Amendment are "legislative cousins." *Id.* at 389, 102 S.Ct. at 3149. They consequently require the same type and standard of proof.

such as departure from procedural norms or a history of discriminatory actions, a case of intentional discrimination may be made. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 264–68, 97 S.Ct. 555, 562–65, 50 L.Ed.2d 450 (1977).

The principles of order and allocation of proof are the same under Section 1981 as they are for Title VII claims of disparate treatment. *Kenyatta v. Bookey Packing Co.,* 649 F.2d 552, 554 (8th Cir.1981). However, it is not necessary to address how the proof should be ordered in this case because the plaintiff did not present sufficient evidence from which a jury could have inferred a discriminatory motive. *See King v. University of Minnesota,* 774 F.2d 224, 228–29 (8th Cir.1985) (discharged tenured professor failed to make prima facie case under Section 1981 and the Court notes that the District Court could have directed a verdict for the defendants on the Section 1981 claim, had the case been tried before a jury).

In the eight days of presentation of evidence by the plaintiff in her case-in-chief, almost all of the facts adduced which related to race were those dealing with the general impact of the Negative Role Model Policy upon black women or single black women (testimony Dr. Harriette McAdoo and Kenneth Goc).[14] And, the Court, for the purposes of its ruling upon the motions for directed verdict, assumed that such impact was relevant and material to a determination of the plaintiff's Section 1981 claim.[15] There was evidence that the plaintiff is a single black woman; that the membership of the Girls Club of Omaha includes many young black women; that many of the members of the Omaha Girls Club are from households headed by a single black woman; that the neighborhood near the north unit of the Omaha Girls Club is inhabited by significant numbers of blacks; that the executive director of the Girls Club of Omaha, a married white woman, was given a paid maternity leave in 1983 and/or 1984; that another black woman, Pamela Simmons, was terminated under this policy; and that in 1983 the unit director of the north unit of the Girls Club, a then single white woman, may have resigned her position three or four weeks after becoming pregnant, and now, after being married, does volunteer and contract-consulting work for the Girls Club. However, the plaintiff failed to adduce evidence that she was treated differently because of her race, that racial animus existed on the part of the staff or any board member, that the Club deviated from its normal procedures, or that race was in anyway a factor in the termination decision, or the decision not to rescind the policy.

In fact, the evidence establishes that the plaintiff herself did not believe at the time she was terminated that she had been discriminated against because of race. Mr. Timothy Butz, investigator for the NEOC, testified that Ms. Chambers never alleged, during the entire course of the investigation, that she believed that she had been discriminated against because she was black. Mr. Butz testified that it was his normal practice to inquire as to why a complainant feels that he or she has been discriminated against and to specifically inquire as to whether race or national origin was a factor. Mr. Butz could not specifically recall this questioning of the plaintiff but indicated that his routine was almost certainly followed in this case (testimony Timothy Butz). The plaintiff, with the aid of Mr. Butz, filed complaints with the NEOC (Exhibit P–61–1) and the EEOC (Exhibit P–61–1A) which allege discrimination on the basis of sex and marital status. Mr. Butz also testified that he uncovered no facts in his investigation which were, in his view, consistent with racial discrimination. He also stated that he had the authority and the obligation under Nebraska law to

---

**14.** For a discussion of the impact of the plaintiff's statistics see infra at 45.

**15.** Impact may be evidence of discriminatory motive and statistics alone may suffice to prove

intent where there is a gross disparity in the treatment of workers. *See Page v. U.S. Industries,* 726 F.2d 1038, 1046 (5th Cir.1984).

amend a complaint on his own if, while investigating, he discovered facts in support of additional discrimination. No amendments were made. In addition, the plaintiff testified that she believed Mr. Butz was competent, knowledgeable and did an "excellent" job in his investigation and recommendations.

As indicated, the plaintiff did not produce any evidence of intentional racial discrimination. On the contrary, both the documentary and testimonial evidence which the plaintiff presented refutes the existence of racial motives. The plaintiff offered the Articles of Incorporation, as amended 1975, which state that the Girls Club's purpose is to serve girls without regard to race, creed or national origin (Exhibit P-19-1, para. 3). In addition, the plaintiff offered the Affirmative Action Plan for Girls Club of Omaha, adopted on October 28, 1981, designed to "correct the effects of past discrimination." (Exhibit P-7-7). The plaintiff's claim of discrimination is also dramatically discredited by the fact that the north unit of the Girls Club was purposefully located to better serve a primarily black population[16] (testimony Marty Schukert, Exhibit P-328); and by the fact that the plaintiff's position was filled by a black staff person who in turn was replaced by a new employee who was also black.

The testimony also shows that the staff, and in particular, Bobbie Kerrigan-Rawley, the Girls Club's white former unit director has continuously acted with great sensitivity for the problems of all staff members regardless of race. For example, Ms. Kerrigan-Rawley provided considerable support to Melanie Wells, a single black staff member who had a child while working at the Club. She loaned Ms. Wells money, drove her to work and to her babysitter, and helped her with the care of her baby (testimony Melanie Wells).

There is absolutely no evidence of any specific instance that a negative racial attitude or comment, from which discrimination could be inferred, has ever been shown or expressed by Girls Club personnel or a member of its board of directors. Based upon the evidence presented, it was simply not possible for a jury to find racial discrimination. Accordingly, the law required that the verdict be directed on the Section 1981 claim. *See Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1978); *Arlington Heights v. Metropolitan Housing Corporation*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

## CONSPIRACY

The defendants in this case have been charged with conspiracy under 42 U.S.C. § 1985(3). This section has its origin in the Civil Rights Act of 1871 and was designed to provide for recovery against those who conspire to deny a person equal protection of the laws or equal privileges and immunities of the law.[17] The statute has been

---

**16.** Although racial composition of the Girls Club's work force could not be considered for the ruling on the motion for a directed verdict because it was not put in evidence until the defendants' case, the Court notes that the work force at the Girls Club is approximately sixty-five percent black (testimony Mary Heng Braun). There are also numerous other documents acknowledging the Girls Club's goal of eliminating discrimination. These were put into evidence by the plaintiff during the defendants' case. (*See, e.g.*, Girls Club of Omaha 1979 Goals and Objectives, Goal 1, Exhibit P-7).

**17.** 42 U.S.C. § 1985(3) reads as follows:

If two or more persons in any State or Territory conspire, or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice-President, or as a member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or

construed to reach conspiracies involving private parties. *Griffin v. Breckenridge,* 403 U.S. 88, 101, 91 S.Ct. 1790, 1797–98, 29 L.Ed.2d 338 (1971). However, the reach of the statute has been limited by the Supreme Court. It cannot be used to litigate general tort claims in a federal forum. *Id.* at 101–02, 91 S.Ct. at 1797–98. The limitation makes the statute applicable only to conspiracies that are motivated by a dislike for a protected class of people. *Id.* Under the *Griffin* analysis there are four elements that must be established in order to prove a conspiracy: (1) that the defendant(s) had an agreement with at least one other person and participated or caused something to be done in furtherance of the agreement; (2) that the agreement was to deprive the plaintiff of a protected right; (3) that the defendant(s) were motivated by a dislike or hateful attitude toward a specific class of people and that the plaintiff was a member of that class; and (4) that the conspiracy caused deprivation or injury to the plaintiff. *Id.* at 103–04, 91 S.Ct. at 1798–99.

Section 1985 is a remedial statute; it does not confer any substantive rights. *Griffin v. Breckenridge,* 403 U.S. at 99–101, 91 S.Ct. at 1796–98; *Great American Federal Savings & Loan Ass'n v. Novotny,* 442 U.S. 366, 372, 99 S.Ct. 2345, 2349, 60 L.Ed.2d 957 (1979). The plaintiff must, therefore, allege violation of an independent right that is protected under the statute. *Griffin* makes a distinction between protected classes and protected rights. *Griffin v. Breckenridge,* 403 U.S. 102–06, 91 S.Ct. 1798–1801. However, exactly which classes and rights are protected is not altogether clear.[18]

■ The facts adduced by the plaintiff regarding the conspiracy claim were intended to establish, at least circumstantially, that persons throughout the Omaha community agreed to deprive the plaintiff of her constitutional rights. Upon a motion for summary judgment, the conspiracy allegations with respect to the Omaha World Herald were carefully considered prior to trial and rejected by the Court (filing 196).[19] However, the Girls Club was

cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of hearing and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators. *Id.*

**18.** In *Griffin* race was used to define the class while freedom of travel was the right to be protected. Note, *The Scope of Section 1985(3) since Griffin v. Breckenridge,* 45 Geo.Wash.L. Rev. 239 (1977); Comment, *Private Conspiracies to Violate Civil Rights,* 90 Harv.L.Rev. 1721 (1977).

**19.** The plaintiff alleged a series of facts in support of her Omaha World-Herald conspiracy theory. The Court considered, for purposes of ruling on the motion for summary judgment, the following facts:
1. That Harold W. Andersen is the President of the Omaha World-Herald, and that G. Woodson Howe and John E. Gottschalk are each a Vice President of the Omaha World-Herald.
2. That Marian Andersen, the wife of Harold W. Andersen, was a member of the Board of the Girls Club of Omaha at the time of the plaintiff's termination, and that she later voted to ratify

the "single parent negative role modeling" policy.
3. That Marian Andersen brought the pregnancy policy to the attention of Harold Andersen some time in early to mid-1982.
4. That on June 28, 1982, Carmen Gottschalk, wife of Omaha World-Herald Vice President John Gottschalk, was appointed by Governor Charles Thone to the Nebraska Equal Opportunity Commission.
5. That at no time did the Omaha World-Herald, Commissioner Gottschalk or Marian Andersen publicly disclose the fact that Commissioner Gottschalk was the wife of the Vice President of the *Omaha World-Herald* newspaper.
6. That at no time did the Omaha World Herald or Marian Andersen or Commissioner Gottschalk publicly disclose that Marian Andersen was a member of the Board of the Girls Club of Omaha or that Marian Andersen, Commissioner Gottschalk, Harold Andersen, John Gottschalk and G. Woodson Howe were personally acquainted.
7. That on July 9, 1982, the NEOC made a determination that there was "no reasonable cause" to believe that the plaintiff had been discriminated against, and that such determination was appealed to the federal EEOC within thirty days thereafter.
8. That on July 26, 1982, the Girls Club of Omaha fired Pamela Simmons, its Program Di-

not dismissed from the conspiracy claim and the claim, therefore, remained an issue for trial. The crux of the conspiracy issue, the plaintiff contends, is that representatives of the Girls Club agreed with one or more individuals or groups to validate a policy designed to condemn all black single mothers as immoral (fourth amended complaint, filing 97, para. III. 6.)

The plaintiff attempted to prove that the Girls Club conspired with members of the NEOC in order to obtain a favorable determination, which the plaintiff believes had the effect of enhancing the credibility of the policy. The plaintiff also attempted to show that the Girls Club engaged the aid of various non-parties, the City of Omaha, Metro Area Right to Life, and the Black Ministerial Alliance, for the purposes of: (1) intimidating the plaintiff; (2) drawing out the proceedings so that the plaintiff would drop her charges; (3) covering up the real intent [discriminatory] of the policy; (4) preventing the community agencies from helping the plaintiff; and (5) engaging in a massive public relations campaign in support of the policy (fourth amended complaint, filing 97, para. 23–56; conference in chambers January 13, 1986).

It would normally be up to a jury to decide whether a conspiracy existed, or a right was violated, or whether class-based animus motivated the conspiracy. However, given the benefit of all reasonable inferences, the jury could not have found from the evidence presented that an agreement existed between the Girls Club and any other group or person which was designed to deprive the plaintiff of a protected right. It is also questionable, as a matter of law, whether a protected right has been alleged which is cognizable under Section 1985(3). A discussion of each element follows:

*1. Agreement*

The threshold requirement for a Section 1985(3) cause of action is some proof of concerted action or agreement between two or more persons. *Griffin v. Breckenridge,* 403 U.S. at 102, 91 S.Ct. at 1798. The plaintiff theorized that the defendants' actions were part of both an intra-corporate conspiracy and a conspiracy with outside individuals and organizations.

■ At the outset, the Court finds that an intra-corporate conspiracy did not exist within the Girls Club. The general rule with respect to intra-corporate conspiracies is that a corporation cannot conspire with itself. *See Runs After v. United States,* 766 F.2d 347, 354 (8th Cir.1985) (Indian tribal council); *Cross v. General Motors Corp.,* 721 F.2d 1152, 1156 (8th Cir.1983), *cert. denied,* 466 U.S. 980, 104 S.Ct. 2364, 80 L.Ed.2d 836 (1984) (corporation); *Baker v. Stuart Broadcasting,* 505 F.2d 181, 183 (8th Cir.1974); *see also Applicability of 42 U.S.C.S. § 1985(3), Providing Remedy to One Injured by Conspiracy to Deprive*

rector, on the sole grounds of her single pregnant status. Miss Simmons is a black female.

9. That on November 25, 1982, the NEOC sent notice that the Simmons case would be considered at its December 10, 1982, meeting.

10. That Harold W. Andersen brought the pregnancy policy to the attention of G. Woodson Howe some time in early to mid-1982.

11. That G. Woodson Howe assigned a reporter to investigate the matter and suggested the subject matter of the policy to his editorial page editors as a possible editorial.

12. That on December 1, 1982, the *Omaha World-Herald* newspaper published an article pertaining to the challenges by plaintiff and her co-worker Pamela Simmons of the Girls Club of Omaha "negative role modeling" policy.

13. That on December 10, 1982, the *Omaha World-Herald* newspaper published an editorial supporting the Girls Club's discharge of the plaintiff and her co-worker and the "negative role modeling" policy.

14. That Marian Andersen and Commissioner Gottschalk did not know that the news story and editorial were being planned until they were published by the newspaper.

15. That Harold Andersen was not specifically aware of the news story or the editorial or their contents until he read them in the newspaper on the day of publication.

The foregoing assertions comprise all of the facts that were conceivably material to the plaintiff's allegations. Whether one believes or disbelieves all or any part of them, they simply do not establish, directly or by inference, any genuine issue of material fact which supports the existence of a conspiracy involving the newspaper or its employees. Accordingly, the Omaha World-Herald and associated defendants were dismissed.

*Him of Civil Rights, To Activity of Single Corporation or to Concerted Activity of Its Directors, Employees, Agents, and the Like,* 52 A.L.R.Fed. 106 (1981); *cf., Great American Federal Savings & Loan Ass'n v. Novotny,* 442, U.S. 366, 372 n. 11, 99 S.Ct. 2345, 2349 n. 11, 60 L.Ed.2d 957 (1979). The theory is that if the challenged act(s) are the act(s) of a single entity, the fact that two or more agents participated is of no consequence. *See Weaver v. Gross,* 605 F.Supp. 210, 214–15 (D.D.C.1985) (rejects theory that continuing violations by single corporation may provide basis for conspiracy).

The law, however, is not without exception. Where individual defendants are named and those individuals acted outside the scope of their employment or for personal reasons, then an intra-corporate conspiracy may be actionable under Section 1985(3). *Cross,* 721 F.2d at 1156. *See Hodgin v. Jefferson,* 447 F.Supp. 804, 807 (D.Md.1978) (unauthorized acts in furtherance of a conspiracy may state a claim under Section 1985(3)); *Rackin v. University of Pennsylvania,* 386 F.Supp. 992, 1005 (E.D.Pa.1974) (tenured members of English department deprived plaintiff of opportunity to teach certain courses, estab-

lished unprecedented requirements for tenure, denied plaintiff tenure and discharged her); *Coley v. M & M Mars, Inc.,* 461 F.Supp. 1073, 1076 (M.D.Ga.1978) (continuing harassment by individual defendants). The actions of Girls Club staff members and Girls Club board members individually named in this suit just do not fit within the exceptions. There is simply no evidence of individual acts of animus or harassment.

With respect to agreements by the Girls Club with individuals or organizations outside of the group, the plaintiff points to the NEOC, the Black Ministerial Alliance, the City of Omaha, and the Metro Right to Life Committee.[20]

The plaintiff alleges that NEOC agreed with the Girls Club to find against the plaintiff on her discrimination charge in order to cover up the discriminatory motive of the Girls Club and to enhance the credibility of the policy. *White v. Bloom,* 621 F.2d 276, 281 (8th Cir.), *cert. denied,* 449 U.S. 995, 101 S.Ct. 533, 66 L.Ed.2d 292 (1980) (conspiracy with an immune defendant is cognizable). Specifically, the plaintiff alleges that the NEOC violated the plaintiff's right to due process when it employed unfair procedures in arriving at its decision.[21]

**20.** The evidence presented primarily focused on the NEOC and Metro Right to Life Committee. The plaintiff called Marty Shukert, City Planning Director, in order to prove: (1) that he was a member of the Board of Directors of the Girls Club; and (2) that he caused City rules and procedures to be violated in order for the Girls Club to obtain grant money for a new gym floor. No evidence of irregularity was established. In fact the witness demonstrated that normal procedures were followed with respect to the grant application. The plaintiff did not pursue this course further.

As to the Black Ministerial Alliance no evidence was put forward regarding any involvement in a conspiracy although, there was evidence that the Alliance was contacted by a representative of the Girls Club for the purpose of permitting the Girls Club to explain rule 11.

**21.** The plaintiff established the following facts at trial to support her charge that the plaintiff's due process was violated: (1) the plaintiff went to the NEOC on the advice of a lawyer; (2) Timothy Butz, an NEOC investigator, helped the plaintiff file a charge; (3) Mr. Butz investigated

the plaintiff's claim and that the claim was fairly investigated according to the plaintiff; (4) Mr. Butz sent a letter to the plaintiff informing her that the information from the investigation would be forwarded to the NEOC for a determination and that she would be notified of their decision (Exhibit P–327); (5) Mr. Butz informed the Girls Club attorney, Mr. Bogue, that he was leaning in favor of the plaintiff; (6) Mr. Bogue inquired of Mr. Butz if there were rules regarding a party's right to be present at a hearing and Mr. Butz told him that it was the existing policy of the NEOC to notify a requesting person of the hearing date (Mr. Butz stated there was no written policy on notice. NEOC Rules and Regulations Exhibit P–317–1); (7) Mr. Bogue requested notice; (8) Mr. Butz jotted a "speed note" to the Commission Secretary, Thelma Riggs, requesting that Mr. Bogue be notified of the hearing date; (9) Mr. Bogue was notified; (10) the plaintiff informed the NEOC on approximately June 22, 1982, that she had a change of address; she did not specifically request notice of the hearing date; (11) Mr. Bogue, Ms. Heng-Braun and Mr. Barbee attended the hearing, asked to be heard and were heard; (12) the plaintiff was not in-

■ This Court does not need to pass upon the constitutionality of the procedures employed by the NEOC, because, even assuming all of the plaintiff's facts to be true and assuming that a due process violation did occur, the plaintiff failed to produce even a shred of evidence from which a jury could infer that such a violation was part of a plan to deprive the plaintiff of her rights. Even if the NEOC procedure was lacking, there is no evidence whatever that it was motivated by discriminatory design. *Dunn v. Gazzola*, 216 F.2d 709, 711 (1st Cir.1954) (failure to give notice to woman plaintiff charged with child neglect does not provide a basis for a Section 1985(3) cause of action).[22]

The only purported links between the Girls Club and the NEOC are Carmen Gottschalk and Marian Andersen who are acquainted with each other through their respective husbands. Mrs. Andersen testified that she did not know that Mrs. Gottschalk was a member of the NEOC until after this case was filed in early 1983. Mrs. Gottschalk testified that she did not know Mrs. Andersen was on the board of the Girls Club at the time she was appointed to the NEOC. Mrs. Gottschalk testified that she did not know anyone who appeared on behalf of the Girls Club at the hearing; and that she did not speak to anyone about this matter, including her spouse, before or after the July 9 hearing. Assuming, arguendo, that a jury were to disbelieve all of the evidence presented by the plaintiff with regard to Ms. Andersen, Commissioner Gottschalk and their knowl-

edge of or communications with each other, there still is no evidence in the record which supports the plaintiff's burden of proof that a conspiracy was formed. There is no evidence that any other Commissioner knew anyone from the Girls Club, or that there was any contact between any representative of the Girls Club and the NEOC, other than as Mr. Butz testified (*see* footnote 20).

The failure of proof on this crucial evidentiary point precluded any inference by a jury that an agreement between the NEOC and the Girls Club could have existed. The Court recognizes that it is not necessary that an agreement be express and that it may be inferred from circumstantial evidence. However, it is simply not reasonable to allow a jury to speculate that two women, acquainted through spousal business activity, may have been conduits through which an unlawful conspiracy flowed. The plaintiff had the duty to present facts, not bare allegations.

■ The plaintiff also claims that the "tentacles" of the conspiracy reached various "affinity" groups in the community and that these groups also agreed with the Girls Club to endorse the policy as part of the alleged cover up. *Any* evidence of an agreement between the defendant Girls Club and a non-party would also have been sufficient to create a question for the jury. However, there was no such evidence presented. The evidence shows that the vice chairman of the Metro Right to Life Committee, Peter Bataillon, was contacted,

formed of the hearing date and did not attend; (13) Mr. Butz did make a recommendation of "reasonable cause;" (14) the NEOC found no "reasonable cause;" (15) the NEOC had never before turned down a Butz recommendation of "reasonable cause;" and (16) the federal EEOC later found "reasonable cause" for discrimination on the basis of sex and marital status.

Mr. Butz made a recommendation that the NEOC find reasonable cause to believe the plaintiff had been discriminated against on the basis of sex and marital status (Exhibit P–67). In the report issued by Mr. Butz he made a finding that rule 11 was not formally in place at the time the plaintiff was fired. At trial he testified that he believed that finding to be in error if the common practice of the Girls Club

was to permit the director to implement policies which were later ratified. He was not asked whether his recommendation would have been different if he had believed the policy to have been in effect at the time of termination.

Mr. Butz also testified that the EEOC determination was based wholly upon his report (which contained his belief that the policy was not in effect).

22. Section 1985(3) does not embrace a cause of action for due process violation. *Oaks v. City of Fairhope*, 515 F.Supp. 1004, 1045 (S.D.Ala.1981); *Weise v. Reisner*, 318 F.Supp. 580, 583 (E.D.Wis. 1970); *Whittington v. Johnson*, 201 F.2d 810, 811 (5th Cir.), *cert. denied*, 346 U.S. 867, 74 S.Ct. 103, 98 L.Ed. 377 (1953).

sometime after the NEOC hearing, by a board member of Girls Club to see if the Girls Club could have an opportunity to respond to comments made within the community about the policy and to present its position with respect to the policy. The request was honored, the Girls Club's position was presented, and the Metro Right to Life Committee was satisfied with the explanation (testimony Peter C. Bataillon). No further action was taken.[23]

Regardless of whether the Metro Right to Life Committee agreed or disagreed with the policy, and regardless of whether the Committee understood or misunderstood how the policy was applied, there is absolutely no evidence that the Committee agreed with the Girls Club to deprive black women or single black women or the plaintiff, in particular, of any rights whatsoever. And an endorsement of the Girls Club policy, if any, by the Metro Area Right to Life Committee, fails to provide even the weakest circumstantial evidence of an agreement to violate the plaintiff's rights or to cover up discrimination.

The plaintiff points toward two other actions to buttress her claim of conspiracy. First, she argues that rule 11 was not effective at the time she was fired, and, that after she was fired, the board of directors officially adopted the policy to cover up the Girls Club's discriminatory actions. Second, the plaintiff points to evidence which shows that after the July 9, 1982, NEOC hearing, the Girls Club had approximately twenty-four internal meetings, i.e., board of directors and staff gatherings, where the policy was discussed. These acts, even if shown to be evidence of

a conspiracy, are only relevant to the intracorporate theory which the Court has already determined could not exist as a matter of law in this case since no individual acts of malfeasance were alleged or established. Therefore, a discussion of these allegations and theories is not necessary with respect to the conspiracy claim (*see* Title VII findings of fact, *infra* ).

### 2. Deprivation of a Protected Right

In order to fully and fairly examine the plaintiff's claims, the Court assumed, for the purposes of the defendants' motions to dismiss made at the close of plaintiff's case-in-chief, that plaintiff could, arguendo, establish that an illicit agreement or understanding was reached. Even then, plaintiff's claim fails.

As stated earlier, Section 1985(3) does not confer any substantive rights. It is merely a statutory channel through which a plaintiff may vindicate alleged violations or deprivations of constitutional rights. *Gobla v. Crestwood School District*, 609 F.Supp. 972, 978 (M.D.Pa.1985). In order for a plaintiff to establish a claim for relief under Section 1985(3), there must be proof that some cognizable, federally protected, predicate right has been violated. *Griffin v. Breckenridge*, 403 U.S. at 103–04, 91 S.Ct. at 1798–99.

Giving the plaintiff the benefit of the most liberal interpretation of her claims, the Court construes the fourth amended complaint (filing 97) as alleging a violation of equal protection or privileges and immunities as a result of discrimination on the basis of race, privacy and gender.[24] The

---

**23.** The plaintiff alleges that application of the policy was misrepresented to the Committee by members of the Girls Club; that based upon the misrepresentation the Committee endorsed the policy; and, that as a result of the endorsement decision, the Committee did not financially contribute to the plaintiff's lawsuit. Mr. Bataillon indicated that even if he had supported the plaintiff's position, the Committee had no money available for such purpose.

**24.** Paragraph 41 of the fourth amended complaint (filing 97, para. 41) states:

That the acts of the officials of the Omaha Girls Club in concert with the Commissioners of the Nebraska Equal Opportunity Commission and its executive director Lawrence Myers constituted a conspiracy to violate the civil rights of the plaintiffs protected by the 1st, 9th, 14th, amendments and 42 USC 1981 and were taken to deprive the plaintiffs of support, employment, reinstatement, health insurance and other benefits and that by adopting in secret a posture that single mothers particularly the black single mothers in the community served by the Club are "immoral per se" and subject to immediate dis-

Court assumes that the basis of the gender. or sex-based claim is that the plaintiff believes that she was treated differently than males because of her sex. And, because the plaintiff has alluded to, but never briefed nor argued, a theory of "privacy," the Court will assume that by pleading violations of the first, ninth and fourteenth amendments that she intended to encompass a "right to privacy" violation. *See, e.g., Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

Lower courts have continued to struggle to determine which rights are protected under the statute.[25] The Supreme Court in *Griffin* suggested that the proper approach in determining the scope of Section 1985(3) is to examine, independently, the rights and classes which the statute protects. *Griffin v. Breckenridge*, 403 U.S. at 102, 106, 91 S.Ct. at 1798, 1800–01. This will be done.

### a. Race

■ For purposes of redressing conspiratorial discrimination based upon race, 42 U.S.C. § 1981 may serve as the substantive basis for a cause of action under Section 1985(3). *Thompson v. International Ass'n of Machinists and Aerospace Workers*, 580 F.Supp. 662, 667–68 (D.D.C.1984). However, the plaintiff was not able to establish sufficient evidence to create a jury

charge when their single parenthood becomes visibly perceivable through the gestation of the infant or fetus in the mothers abdomen and that said gestation is a negative role model for the girls served by the Club. *Id.*

**25.** *See, e.g., Griffin v. Breckenridge*, 403 U.S. at 105, 91 S.Ct. at 1800 (right to travel); *Means v. Wilson*, 522 F.2d 833, 838–39 (8th Cir.1975), *cert. denied*, 424 U.S. 958, 96 S.Ct. 1436, 47 L.Ed.2d 364 (1976) (right to vote in tribal elections); *Action v. Gannon*, 450 F.2d 1227 (8th Cir.1971) (right of religious freedom); *Gobla v. Crestwood School Dist.*, 609 F.Supp. 972, 978 (D.Pa.1985) (right to equal protection—freedom from sexual harassment); Note, *The Scope of Section 1985(3) Since Griffin v. Breckenridge*, 45 Geo.Wash.L. Rev. 239 (1977).

question under Section 1981. Therefore, the evidence is not sufficient to provide the substantive basis for Section 1985(3) purposes.

### b. Sex

■ In order to address the plaintiff's claim of conspiracy to discriminate on the basis of sex, it must first be determined whether such a claim is legally cognizable under Section 1985(3). In *Great American Federal Savings & Loan Ass'n v. Novotny*, the Supreme Court held that employment discrimination claims which are covered by the statutory scheme of Title VII cannot be asserted through a Section 1985(3) claim, 442 U.S. at 378. The plaintiff's sex-based claim appears to address an allegedly unlawful employment practice covered by Title VII (pregnancy) and *Novotny*, therefore, bars the Section 1985(3) sex-based claim.

### c. Privacy

It is the allegations involving the right to privacy that are more problematic. At the crux of the privacy argument is a belief held by the plaintiff that rule 11 is, in reality, a morality standard intended to discriminate against black females, (fourth amended complaint, filing 97, par. 15).[26] The plaintiff also argues that the policy was designed to promote abortion by making abortion a condition of employment.[27]

**26.** The plaintiff argues that abortion is not a viable choice for black women because of cultural patterns (testimony Dr. McAdoo). Dr. McAdoo, the plaintiff's expert witness, provided no statistics on this point and those supplied by Mr. Kenneth Goc, employee of the Bureau of Vital Statistics of Douglas County, seem to indicate that such is not the case. Mr. Kenneth Goc stated that the abortion rate among blacks in Nebraska in 1978 was six percent of the total abortions performed in Nebraska, while the rate for whites was ninety-two percent of the total abortions. Since only approximately three percent (a fact of which this Court takes judicial notice) of the State's population is black, the abortion rate for blacks, even considering a higher fertility rate during child bearing years, appears to be at least as high as that for whites.

**27.** In support of this claim the plaintiff points out that a Girls Club staff member, Joy Lewis

And, because a man can more easily conceal his involvement in an unmarried pregnancy, he is not subjected to similar treatment. In *Novotny* no substantive rights besides Title VII were alleged as the basis of Section 1985(3). The Court found it unnecessary to consider "whether a plaintiff would have a cause of action under § 1985(3) where the defendant was not subject to suit under Title VII or a comparable statute." *Great American Federal Savings & Loan Ass'n v. Novotny,* 442 U.S. at 370 n. 6, 99 S.Ct. at 2348 n. 6. Following *Novotny* it has been held that Section 1985(3) does provide a cause of action where Title VII has not been pled. *See, e.g., Skadegaard v. Farrell,* 578 F.Supp. 1209, 1218 (D.N.J.1984) (sexual harassment). In so holding the Court pointed out that the right which the plaintiff sought to protect was " 'independent' of those provided in Title VII" and existed before the passage of Title VII. *Id.* at 1218.

The right of privacy would appear to be "independent" of any rights protected by Title VII.[28] The Court has been unable to find any case wherein the right of privacy has formed the substantive basis of a Section 1985(3) conspiracy.[29] And, although privacy may well provide a claim, it is not necessary for the Court to resolve the issue

here because the plaintiff has failed to adduce any evidence which creates a jury question under the third prong of the *Griffin* test requiring class-based animus.

### 3. Class Based Invidiously Discriminatory Animus

In addition to establishing that the defendants entered into an agreement to deprive the plaintiff of protected rights, the plaintiff was required to present some evidence that the defendants were motivated because the plaintiff was a member of a class that the defendants disliked or hated. *Griffin v. Breckenridge,* 403 U.S. at 102, 91 S.Ct. at 1798; *Shortbull v. Looking Elk,* 507 F.Supp. 917, 921 (S.D.1981), *aff'd,* 677 F.2d 645 (8th Cir.), *cert. denied,* 459 U.S. 907, 103 S.Ct. 211, 74 L.Ed.2d 168 (1982). There are two prongs associated with this element of the *Griffin* test. First, *Griffin's* language requires that the plaintiff be a member of, or associated with a protected class. *Griffin v. Breckenridge,* 403 U.S. at 102–03, 91 S.Ct. at 1798–99. Second, there is a requirement that there be a "mens rea" present, i.e., that the conspirators have a particular hatred of the protected group. *Shortbull v. Looking*

---

had an abortion and kept her job, (Ms. Lewis is black). The testimony of Ms. Lewis shows that she told Bobbie Kerrigan-Rawley, her supervisor and friend, that she was pregnant and going to have an abortion so that she could play basketball, that Ms. Kerrigan-Rawley strenuously counseled Ms. Lewis against the abortion, that Ms. Lewis had the abortion anyway very shortly after the conversation.

Ms. Heng-Braun testified that she was not aware that Joy Lewis was pregnant or that she was going to have an abortion until Ms. Lewis was either at the doctor's office or had already had the abortion, and that the abortion was not a condition for keeping the job.

28. Whether the right of privacy has been held to encompass protection for a single person's right to bear children is unresolved. *Snyder v. Kurvers,* 767 F.2d 489, 497 (8th Cir.1985) (sexual conduct outside of marriage is not "basic unquestioned constitutional right" necessarily protected by privacy).

29. If coverage of the fundamental rights doctrine extends to single persons, such a right would most assuredly come within the gambit

of protection afforded by Section 1985(3). *See McLellan v. Mississippi Power & Light Co.,* 545 F.2d 919, 925 (5th Cir.1977) (persons asserting fundamental rights are a cognizable "class" under Section 1985(3) ). Assuming such protection would be available the question still remains whether the right of privacy is protected from purely private action. *Carchman v. Korman Corp.,* 456 F.Supp. 730, 732, n. 3 (E.D.Pa. 1978). There is a split among the circuits on this issue. The Eighth Circuit held in *Action v. Gannon,* 450 F.2d 1227 (8th Cir.1971) that religious rights secured by the first amendment and protected by the fourteenth amendment are protected from private as well as state conduct. *Id.* at 1232–33. However, since that ruling, the Supreme Court has indicated, without ruling on the matter directly, that without some state action, Section 1985(3) does not create a cause of action for "private violations" of the first or fourteenth amendments. *United Brotherhood of Carpenters & Joiners v. Scott,* 463 U.S. 825, 831–34, 103 S.Ct. 3352, 3357–58, 77 L.Ed.2d 1049 (1983).

*Elk,* 507 F.Supp. at 921, *quoting, Harrison v. Brooks,* 519 F.2d 1358 (1st Cir.1975).

█ Not surprisingly both women and blacks are cognizable classes under *Griffin. Life Insurance Co. of North America v. Reichardt,* 591 F.2d 499, 505 (9th Cir. 1979) (conspiracy against a class defined by sex); *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (conspiracy against class defined by race). The plaintiff in this case is defined by both race and sex, alone or in combination. *Jefferies v. Harris County Community Action Ass'n,* 615 F.2d 1025, 1032–33 (5th Cir.1980) (class defined as black women). The class or classes of which the plaintiff is a member are clearly within the protection of the statute.

█ It is the "invidiously discriminatory animus" requirement of the *Griffin* test where the plaintiff has failed. Evidence of adverse impact, if any, simply does not fulfill the mens rea requirement necessary to show irrational or invidious class discrimination. *See Shortbull v. Looking Elk,* 507 F.Supp. at 921.[30] The fact that the enforcement of the policy, initially or later, may have already impacted or perhaps will impact women, blacks, black women or single black women, more heavily is irrelevant. There is no evidence of an agreement, or understanding, or intent, to invidiously discriminate against any such group.

*4. Injury or Deprivation*

The final element for which the plaintiff was required to produce evidence is that the alleged act(s) in furtherance of the conspiratorial agreement caused her injury or deprivation. *Griffin v. Breckenridge,* 403 U.S. at 103, 91 S.Ct. at 1798–99. Unlike a criminal conspiracy the gravamen of a civil conspiracy is resulting damage *Nalle v. Oyster,* 230 U.S. 165, 183, 33 S.Ct. 1043, 1048, 57 L.Ed. 1439 (1913). The plaintiff claims that she lost her job, incurred medi-cal costs, and suffered emotional distress. Because the Court has concluded: (1) no agreement existed; (2) there may have been no cognizable right; and (3) no class-based animus was present, it is not necessary to examine the causal relationship between the alleged acts and the alleged harm.

## COMMON LAW CONSPIRACY

█ The plaintiff failed to establish sufficient facts to defeat the defendants' motion for a directed verdict on the issue of common law conspiracy. The elements which must be proven for common law conspiracy essentially mirror the requirement of 42 U.S.C. § 1985(3), with the exception that there need not be a showing of racial animus. *Dixon v. Reconciliation, Inc.,* 206 Neb. 45, 291 N.W.2d 230, 233 (1980).

*Conclusion*

In retrospect the foregoing analysis may seem overly detailed and unnecessarily analytical. However, the Court is very mindful that jury issues should be preserved for jury consideration. In fact, the admonition of the Court of Appeals to reserve ruling on issues of sufficiency of evidence until after a jury verdict is usually followed by this Court. Therefore, the sustaining of a *motion to dismiss upon completion of the plaintiff's case-in-chief happens only after careful consideration of the evidence adduced. Nonetheless, this is a case in which such action was proper.

The plaintiff has sought, through a series of judgmental allegations and conclusory affidavits and statements, to spin a web of deceit, discrimination and conspiracy involving dozens, even hundreds, of individuals and organizations in the Omaha community. At some point, illusory conclusions and unsupported suspicions must give way to fact. Mere contentions which are

---

**30.** "The requirement that the discrimination be 'class-based' is not satisfied by an allegation that there was a conspiracy which affected the interests of a class of persons similarly situated with the plaintiffs ...," *Shortbull v. Looking Elk,* 507 F.Supp. 921, *quoting, Harrison v. Brooks,* 519 F.2d 1358 (1st Cir.1975).

passed off as established fact must be held up to critical analysis. Otherwise, our system of justice becomes a vehicle for slander, intimidation, and character assassination.

Every law suit must be a search for truth. Here, the truth is that plaintiff, given the chance, failed to connect slightly related facts with anything relevant to the real issues of the case. Therefore, the dismissal is and was correct.

## TITLE VII

The Title VII claims were not dismissed at the conclusion of the plaintiff's evidence. They were the subject matter of evidence from the defendants and rebuttal evidence from the plaintiff. Accordingly, the Court begins, anew, an analysis of the facts and law as they may be applicable to the Title VII issues.

**31.** The Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), *infra* note 33 treats discrimination on the basis of pregnancy the same as discrimination on the basis of sex.

**32.** The plaintiff checked the spaces provided on the NEOC form alleging discrimination on the basis of marital status and sex. The EEOC form does not provide for allegations of discrimination based upon marital status. She, therefore, only alleged sex discrimination on the EEOC form. The plaintiff indicated on both complaints that she believed the particulars of the discrimination to be:

I am a pregnant female who is unmarried. I was employed by the Respondent as the Arts and Crafts Coordinator from 2/80 until 4/15/82.
On Feb. 8, 1982 (approximate date) I informed my supervisor that I was pregnant. On Feb. 22, 1982, I was given a letter stating that I was terminated because I was pregnant and unmarried.
I believe that my termination was illegal discrimination based on my Sex (Pregnant Female) because:
 1. The Respondent did not have a policy on unwed mothers prior to my informing them that I was pregnant;
 2. My pregnancy did not interfere with my ability to perform my job;
 3. I was performing my job in an adequate manner.
For the above reasons, I allege discrimination Sex (Pregnant Female) under Title VII of the Civil Rights Act of 1964, as amended.

This action presents a novel question: whether a private service organization, which by all accounts is dedicated to helping young girls reach their fullest potential, may, without being guilty of discrimination under the law, fire unmarried women who become pregnant? The ultimate issue in this case is whether the rule permitting the termination of single employees who become pregnant, or cause a pregnancy, unlawfully discriminates against the plaintiff, individually, or has an unlawfully discriminatory impact upon a class of women or black women, of which the plaintiff is a member.[31]

## SCOPE OF THE CLAIM

 The charges which were originally filed by the plaintiff with the NEOC and EEOC alleged discrimination on the basis of sex and marital status (Exhibits P–61–1 and P–61–1A).[32] The charges were investigated as sex and marital status violations.[33]

The Court recognizes that discrimination based upon marital status is not specifically addressed within the language of Title VII. However, because Title VII does not specifically prohibit discrimination based upon marital status, Courts have construed marital restrictions as coming within the coverage of Title VII. *See, e.g., Sprogis v. United Airlines, Inc.,* 444 F.2d 1194 (7th Cir.), *cert. denied,* 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971) (no marriage rule for stewardesses invalid under 42 U.S.C. § 2000e–2(a)(1) ); Sex Discrimination—Marital Status 34 A.L.R.Fed. 648 (1977). *See* Neb.Rev. Stat. § 48–1104 (Reissue 1984) which makes it an unlawful employment practice to discriminate on the basis of marital status.

**33.** Title VII prohibits discrimination on the basis of sex and pregnancy.

It shall be an unlawful employment practice for an employer—
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
42 U.S.C. § 2000e–2(a).

The plaintiff now seeks to attack the rule on the basis of race and gender discrimination. The law permits the scope of the lawsuit to exceed the scope of the charges where the kind of discrimination which is alleged in the lawsuit is related to, or growing out of, the allegations made during the pendency of the case before the Commission. *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir.1970) (charge of harassment and discharge will support complaint alleging discrimination in promotion); *see also Johnson v. Nekoosa-Edwards Paper Co.*, 558 F.2d 841, 846 n. 11 (8th Cir.), *cert. denied*, 434 U.S. 920, 98 S.Ct. 394, 54 L.Ed.2d 276 (1977). The plaintiff alleges that "black single women" comprise the class adversely affected by rule 11. In essence, the plaintiff is alleging a combination of racial and sex-based discrimination.[34] This Court will address race

discrimination only insofar as rule 11 may have an impact upon the class of black women. To the extent that the plaintiff seeks to independently address racial discrimination under Title VII, the claim is barred.[35]

## NATURE OF THE CASE

This case is neither a class action nor a "mixed motive" case.[36] It is also unclear whether plaintiff has sought to advance this case on a theory of disparate impact or disparate treatment, or both.

Often the distinctions between the theories are not clear.[37] It is not uncommon for a disparate treatment claim and disparate impact claim to arise in the same litigation from the same set of facts. *See, e.g., Jones v. International Paper Co.*, 720 F.2d 496, 499–500 (8th Cir.1983).[38]

---

In addition, Title VII states:

The terms "because of sex" or "on the basis of sex" include; but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section 2000e–2(h) of this title shall be interpreted to permit otherwise. This subsection shall not require an employer to pay for health insurance benefits for abortion, except where the life of the motion would be endangered if the fetus were carried to term or except where medical complications have arisen from an abortion: *Provided*, That nothing herein shall preclude an employer from providing abortion benefits or otherwise affect bargaining agreements in regard to abortion.

42 U.S.C. § 2000e(k).

**34.** The idea of combining statutory remedies was rejected in *DeGraffenreid v. General Motors*, 413 F.Supp. 142, 143 (E.D.Mo.1976), as creating a "super remedy" which would provide relief beyond what the drafters of the statute intended. The Eighth Circuit did not reach this issue but left the question open. Judge Bright stated, "We do not subscribe entirely to the district court's reasoning in rejecting appellants' claims of race and sex discrimination under Title VII." *DeGraffenreid v. General Motors*, 558 F.2d 480, 484 (8th Cir.1977).

This Court adopts the reasoning of the Fifth Circuit which treats black females as a subclass

of women and analogizes the combination to a "sex plus" theory of discrimination. *Jefferies v. Harris County Community Action Ass'n*, 615 F.2d 1025, 1032–34 (5th Cir.1980). The Court stated, "In the absence of a clear expression by Congress that it did not intend to provide protection against discrimination directed especially toward black women as a class separate and distinct from the class of women and the class of blacks, we cannot condone a result that leaves black women without a viable Title VII remedy." *Id.* at 1032.

**35.** The Court's ruling on the claim under 42 U.S.C. § 1981 precludes a finding of discrimination on the basis of race under Title VII under the doctrine of collateral estoppel. *Lartius v. Iowa Dept. of Transp.*, 705 F.2d 1018, 1020 (8th Cir.1983).

**36.** Certification of a class was never sought.

The defendant does not contend that the plaintiff was fired for any reason other than the pregnancy (see termination letter, Exhibit P–30). Therefore, this case is not a mixed motive case and analysis under *Bibbs v. Block*, 778 F.2d 1318 (8th Cir.1985) would not be appropriate.

**37.** The Eighth Circuit has recently discussed both theories. *Easley v. Anheuser-Busch, Inc.*, 758 F.2d 251 (8th Cir.1985); *see also Page v. U.S. Industries, Inc.*, 726 F.2d 1038 (5th Cir.1984). The Court analyzed the evidence under both theories.

**38.** When both theories are analyzed, a finding of no adverse impact carries no implication on whether or not there was disparate treatment.

Claims of disparate impact are often utilized for class actions where it is alleged that a facially neutral rule falls more harshly on one group than on another. *See, e.g., Reed v. Arlington Hotel Co.,* 476 F.2d 721, 723 (8th Cir.), *cert. denied,* 414 U.S. 854, 94 S.Ct. 153, 38 L.Ed.2d 103 (1973).[39] There are, however, situations where it is appropriate for an individual to proceed under a disparate impact theory. *Lasso v. Woodmen of the World Life Insurance Co.,* 741 F.2d 1241, 1245 (10th Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 2320, 85 L.Ed.2d 839 (1985); *Rule v. International Ass'n of Bridge, Structural and Ornamental Ironworkers,* 568 F.2d 558, 566 (8th Cir.1977) (individual claims in the nature of a pattern and practice suit). Under the facts of this case, an analysis under both disparate impact and disparate treatment is proper.

## FINDINGS OF FACT

The Court adopts the findings of fact set forth in its earlier discussions.[40] The Court further finds as follows:

(1) The Girls Club employed approximately 132 different persons between 1975 and 1982. The work force at all relevant times was approximately sixty-five percent black and has never been less than fifty percent black. The work force is and has always been primarily female; there were sixteen males employed between the years 1975 and 1982;

(2) At the time that rule 11 was implemented there were ten staff members at the North Omaha Girls Club (nine were single and female, one was married and female);

(3) The Girls Club of Omaha has been actively engaged in a comprehensive program to reduce teenage pregnancies for at least five years;

(4) Rule 11 was developed by the executive director, Mary Heng-Braun, after two single staff members, Melanie Wells and Jody Price, became pregnant in 1981;

(5) The rule was also adopted in response to the reaction of a fourteen year old Girls Club member (Sheila Brown) stating that she wanted to have a baby as cute as Marchese (Melanie Well's baby) and that shortly thereafter Ms. Brown did become pregnant. And, the rule was adopted in response to the reaction of another member, Sue Miller, who became upset when she learned of Ms. Price's pregnancy;

(6) Ms. Heng-Braun discussed the policy with several staff members, and her personal attorney before she decided to promulgate the rule;

(7) The Girls Club of Omaha considered the alternatives of transferring the duties of a single employee who becomes pregnant to areas away from the girls ("non-contact areas"), and of providing for a leave of absence. It was concluded that to transfer duties to a "non-contact area" during the time that the pregnancy "shows" is not possible since there are no jobs at the Girls Club where an employee would not be in contact with the girls. It was also concluded that a

*Royal v. Missouri Hwy. & Transp. Comm'n,* 655 F.2d 159, 163 n. 4 (8th Cir.1981).

**39.** The Court in *Reed v. Arlington* allowed a black person who had been terminated, to bring a class action "As a black and a former employee, the plaintiff was subject to the same racial discriminatory policies as other members of the class." 476 F.2d at 723. Here, as noted above, the plaintiff did not seek certification to represent the class of black women.

**40.** A summary of such facts include: (1) plaintiff is a black single woman; (2) membership in Girls Club of Omaha includes large numbers of black women, many of whom are from single parent families; (3) the neighborhood where the north unit of the Girls Club is located is inhabited by black residents; (4) the executive director is a married white woman; (5) the executive director was given a six-week paid maternity leave; (6) another black single woman was fired pursuant to the policy after the plaintiff; (7) Ms. Kerrigan-Rawley, the white deputy director provided emotional support for many black staff members and in one case provided financial help; (8) Ms. Kerrigan-Rawley became pregnant while single and resigned very shortly before or very shortly after she knew of the pregnancy. Ms. Kerrigan-Rawley was married prior to the birth of her child and prior to returning to Girls Club of Omaha as a volunteer and paid consultant.

leave of absence from the time the girls would be able to discover (or see or find out about) the pregnancy until after the baby is born (approximately five to six months) would disrupt the close relationships which the girls develop with staff members and would not be workable;

(8) Ms. Kerrigan-Rawley announced the policy at a staff meeting on October 31, 1981;

(9) The plaintiff was at the October 31, 1981 meeting and heard Ms. Kerrigan-Rawley announce the rule;

(10) The Girls Club was acting pursuant to its normal procedure when the policy was announced and that the policy was effective from the date announced, October 31, 1981;

(11) The ratification of the policy by the Board of Directors on March 15, 1982, was in the normal course of business;

(12) After the plaintiff knew of the policy and before she became pregnant, she attended at least one fertility class at St. Joseph Hospital and kept a temperature chart to ascertain when it would be most likely that she could become pregnant;

(13) The plaintiff was well liked by the staff and the girls at the Girls Club;

(14) The plaintiff was fired solely because of her pregnancy; not because of premarital sexual activity and not because of inferior work;

(15) After the plaintiff was fired offers were made by staff members and board members to help the plaintiff find employment but the plaintiff did not avail herself of these offers;

(16) The plaintiff's NEOC and EEOC complaints were never amended to include claims of racial discrimination;

(17) Abortion is no more or no less probable in Nebraska for a black female than a white female (*see* supra note 26);

(18) Joy Lewis, a single black staff member, had an abortion after rule 11 was in effect in order to play basketball, not to keep her job;

(19) There is no evidence that the policy promotes abortion.

## DISPARATE TREATMENT

Disparate treatment occurs when an employer treats some person less favorably than others because of race, color, religion, sex or national origin. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396 (1977) (pattern and practice case of racial discrimination). Proof of discriminatory motive is critical, although in some situations it can be inferred from differences in treatment. *Id.*

The Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) established a method for allocating the burdens of production in a disparate treatment case.[41] By its own terms *McDonnell Douglas,* did not establish an exclusive method for the order and allocation of proof. *Id.* at 802, n. 13, 93 S.Ct. 1824, n. 13. The ultimate inquiry in a disparate treatment case, however fashioned, is whether the defendant intentionally discriminated against the plaintiff. *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 715,

---

**41.** To establish a prima facie case on a disparate treatment claim the plaintiff has the burden of production to show: (1) membership in a protected group; (2) qualification for the job; (3) rejection; and (4) that the employer continued to seek applicants. *Id.* 411 U.S. at 802, 93 S.Ct. at 1824. The burden of production then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* at 802, 93 S.Ct. at 1824. If the defendant carries its burden, the burden of production shifts back to the plaintiff to show that the defendants' stated reason was pretextual.

These burdens have been adapted to discharge cases and promotion cases. *See, e.g., Worthy v. United States Steel Corp.* 616 F.2d 698 (3rd Cir. 1980), *Davis v. Lambert of Ark. Inc.,* 781 F.2d 658 (8th Cir.1986) (failure to recall discharge); *Royal v. Missouri Hwy. and Transp. Comm'n,* 655 F.2d 159, 163 (8th Cir.1981); But see, *King v. Yellow Freight,* 523 F.2d 879, 882 (8th Cir. 1975), (the Eighth Circuit indicated that the allocation of burdens has doubtful application in a discharge case).

103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983). In a disparate treatment case the burden of showing intentional discrimination remains with the plaintiff. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. at 805–06, 93 S.Ct. at 1825–26. As a practical matter, a disparate treatment case comes down to whether the plaintiff can meet her burden of proving that the defendants' articulated non-discriminatory reason is not the real reason she was terminated.

The plaintiff: (1) having identified herself as a member of a protected group under Title VII, a black female; (2) being qualified for the job; (3) being discharged from the job because of pregnancy; and, (4) having been replaced by a single non-pregnant black woman, made out a prima facie case of intentional discrimination. *Zuniga v. Kleberg County Hospital*, 692 F.2d 986, 991 (5th Cir.1982) (discrimination on the basis of pregnancy is prima facie evidence of a violation under Section 703(a)(2) of Title VII).[42] This worked to shift the burden of production to the Girls Club to explain clearly the non-discriminatory reasons for its actions. *Texas Department of Community Affairs v. Burdine*, 450 U.S. at 255–56, 101 S.Ct. at 1094–95. The defendants' burden is not a heavy one. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. *Id.*

The Court believes that the defendants' articulated reason for the rule, i.e., to provide positive role models in an attempt to discourage teenagers from becoming preg-

nant, is a legitimate, nondiscriminatory reason that was clearly explained. The Court finds, therefore, that the defendants have successfully rebutted the plaintiff's prima facie case. Finding this to be so, the burden shifted back to the plaintiff to show that the Girls Club's proffered reason for the rule was a pretext for discriminating against black women or single black women.

The plaintiff's evidence of pretext generally tries to establish that the rule is a cover up for the Girls Club's "morality standard" which disapproves of black single mothers. To that end, the plaintiff tried to prove: (1) that the rule required intrusion into the staff members' private lives; (2) that less restrictive alternatives were available such as a leave of absence or transfer of duties; (3) that the rule is applied in an irrational manner, i.e., it applies to single pregnant women but not to single mothers; (4) that the rule promotes abortion and abortion is not a viable option for black women; (5) that the rule impacts black women more harshly; and (6) that ratification of the rule by the board of directors was an attempt to cover up animus toward the plaintiff.

The defendants' evidence was responsive to the plaintiff's claims of pretext and rebutted any suggestion of discriminatory intent on the part of the Girls Club. *See Furnco Construction Corp. v. Waters*, 438 U.S. 567, 580, 98 S.Ct. 2943, 2951, 57 L.Ed.2d 957 (1978) (proof that employer's work force was racially balanced or contained disproportionately high percentage of minority employees is relevant to the issue of intent).[43] The plaintiff has failed

**42.** The defendants contend that the plaintiff was not qualified for the job because she was single and pregnant and that her job did not remain open but was filled with another black woman. The Court recognizes that the *McDonnell Douglas* formulation is not perfectly suited to this situation, but also notes, that the burden is quite light for a plaintiff in attempting to make a prima facie disparate treatment case. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 at 253, 101 S.Ct. 1089 at 1093–94, 67 L.Ed.2d 207 (1981).

**43.** The defendants proved the following: (1) The staff members were not questioned about a possible pregnancy unless there was a reasonable belief that the staff person was pregnant and, the private lives of staff members was not a concern of the Girls Club; (2) For a discussion of alternatives, *see* Finding of Fact No. 7. *See Roller v. City of San Mateo*, 399 F.Sup. 358, 364 (N.D.Ca.1975), *aff'd*, 572 F.2d 1311 (9th Cir. 1977) (defendant's showing he had no light work available held sufficient to avoid a finding of discrimination). (3) The statistics do provide some evidence of discriminatory effect which

to meet her ultimate burden of establishing intentional discrimination.

## DISPARATE IMPACT

The Supreme Court first applied the disparate impact theory in a sex discrimination case in *Nashville Gas Co. v. Satty*, 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977) (effect of neutral policy denying seniority to women returning from pregnancy leave).

Ostensibly, claims of disparate treatment require proof of discriminatory intent, while claims of disparate impact require only proof of discriminatory effect. *Teamsters v. United States*, 431 U.S. at 336 n. 15, 97 S.Ct. at 1854–55 n. 15. However, the distinction may be elusive. *Washington v. Davis*, 426 U.S. 229, 254, 96 S.Ct. 2040, 2054, 48 L.Ed.2d 597 (1976) (Stevens, J. concurring) (class-wide claim of disparate impact). To establish a prima facie case of disparate impact

> [P]laintiffs must show that a facially neutral employment practice has a significantly adverse impact on a protected group. Once that showing is made, the burden shifts to the employer to demonstrate that the practice has a manifest relationship to the employment in question and is justified by business necessity. If the employer meets this burden, the plaintiffs may then show that other practices, which lack a similarly discriminatory effect, would satisfy the employer's legitimate interests. Such a showing would be evidence that the employer was using the practice as a mere pretext for discrimination. *See, e.g., Connecticut v. Teal*, 457 U.S. 440, 446–47 [102 S.Ct. 2525, 2530–31, 73 L.Ed.2d 130] (1982); *Albemarle Paper Co. v. Moody*,

422 U.S. 405, 425 [95 S.Ct. 2362, 2375, 45 L.Ed.2d 280] (1975); *Griggs v. Duke Power Co.*, 401 U.S. 424, 430–32 [91 S.Ct. 849, 853–54, 28 L.Ed.2d 158] (1971).

*Easley v. Anheuser-Busch*, 758 F.2d 251 (8th Cir.1985).

There are various methods of establishing the adverse impact of a purportedly neutral rule. It is the burden of a plaintiff to show that the policy at issue has a significant effect on the group in question. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (test had greater impact upon black applicants). Adequate proof of adverse impact requires that a plaintiff direct the data toward those class members who are qualified for the job in the relevant labor market of the actual geographic area from which the defendant draws employees. *Donnell v. General Motors Corporation*, 576 F.2d 1292, 1297–98 (8th Cir.1978).

In *Green v. Missouri Pacific Railroad Co.*, 523 F.2d 1290 (8th Cir.1975), the Court identified three ways of establishing disproportionate impact. The plaintiff may attempt to determine: (1) whether blacks (or women or black women) as a class or at least blacks (or women or black women) in a specified geographical area are excluded by the suspect practice at a substantially higher rate than whites (or men); (2) the percentages of class member applicants [employees] that are actually excluded by the practice or policy, or (3) the level of employment of blacks (black women) by the employer in comparison with the percentage of blacks in the relevant labor market or geographic area. 523 F.2d at 1293–94.

Under the *Green* formulation, the plaintiff clearly cannot make a case of impact

---

may be evidence of intent. However, in order to make a prima facie case of disparate treatment without more than statistics, the data must be very significant and show a gross disparity (which the plaintiff has failed to show.) *See infra* note 45. *Page v. U.S. Industries, Inc.*, 726 F.2d at 1046.

The Court also found that abortion is not less likely for black females, (Finding of Fact No. 17) (testimony of Kenneth Goc); that there is no evidence that the policy promotes abortion; and

that ratification of the rule was in accordance with normal corporate practice (Finding of Fact No. 11).

The Court notes that the policy may not resolve the entire problem, but the Court is mindful that the purpose of the rule is the resolution of a serious social problem. *Cf. Williamson v. Lee Optical*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1950) (a problem may be resolved "one step at a time." *Id.*).

under method three. The general population statistics indicate the geographic area surrounding Omaha is approximately twelve percent black and that the Girls Club of Omaha employs a staff which is approximately sixty-five percent black. The plaintiff's statistics are also of doubtful relevance under method two because there has been only three instances in which the policy has been applied since it was announced (two black women have been terminated and one white female voluntarily left as a result of becoming pregnant while single).

■ Giving the plaintiff every benefit, the Court assumes that she has generally tried to prove up her claim under method one, i.e., that under the rule black females of child bearing age within the Douglas County, Nebraska, area (and in some cases Nebraska) would either not be hired or would be terminated at a substantially higher rate than white females in the same

area.[44] The Court finds that because of the significantly higher fertility rate among black females the rule banning single pregnancies would impact black women more harshly.[45]

The plaintiff thus having established disparate impact shifts the burden to the Girls Club to either refute the existence of disproportionate impact,[46] justify the policy as a business necessity (job related) [47] or establish the existence of a statutory bona fide job occupation qualification (bfoq).[48]

■ The defendants did not seriously attempt to rebut the statistical evidence put forward by the plaintiff. Rather, they focused on establishing the policy as a business necessity or a bfoq. In order for a defendant to establish business necessity, it must show a close nexus between the policy in question and a "substantial end goal" of the employer. *Robinson v. Lorillard Corp.*, 444 F.2d 791, 798 (4th Cir.

**44.** The plaintiff's statistical data include: Nebraska 1978 Statistical Report of Abortions (P–45–1); Nebraska 1983 Statistical Report of Abortion (P–45–2); Percentage of Abortions of Whites As Compared to Blacks (P–45–3); Omaha Douglas County Birth Reports 1978 and 1979 (P–45–6 and P–45–7); Statewide 1978 Abortions Never Married (P–47–1); Nebraska Birth Order Out-of-Wedlock 1976 (P–47–7); Out-of-Wedlock Births as a Percentage of All Births (P–47–3); Teenage Birth—Douglas County (P–47–4); Adolescent Pregnancy in Nebraska (P–47–8); Summary of Statistics—Mr. Goc (P–318); Births to Unmarried Women—Unwanted Births—U.S. National Center for Health Statistics (P–49–1); Birth Statistics 1983 (P–49–7).

**45.** The testimony indicates that the Girls Club of Omaha has hired part-time personnel as young as sixteen. The statistics which were utilized include fifteen year old females. Since the age of employment at the Girls Club is not fixed by any particular policy, the Court has considered these statistics in reaching its conclusion that a prima facie case exists, (P–47–2).

The evidence shows: (1) that in 1981 the fertility rate for teenage whites in the Douglas County area was 36.2 per thousand (or 3.6 per hundred) as compared to 107.1 per thousand for non-white teenagers (or 10.7 per hundred) (testimony Kenneth Goc); with respect to teenagers (age fifteen to nineteen), the fertility rate of black teenagers is approximately 2½ times greater than that of whites. With respect to the

overall fertility rates, whites as a class are likely to become pregnant approximately seventy percent as often as blacks. The defendants did not rebut these statistics.

Given the fact that the defendants did not establish any special qualifications for employment at the Girls Club, the Court believes that the general population statistics for persons 16 and over may be used as a basis for comparison (general population of area shows 12.8% of population is black).

From these facts, it is possible, even in the absence of more specific data, to conclude that the impact of the rule would fall more harshly on black women of child-bearing age.

**46.** *Ramirez v. City of Omaha*, 538 F.Supp. 7, 22 (D.Neb.1981), *aff'd*, 678 F.2d 751 (8th Cir.1982) (rebuttal of prima facie case—court held failure to introduce records of white candidates resulted in failure to make prima facie case).

**47.** *Griggs v. Duke Power, Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971) ("If an employment practice which operates to exclude Negroes (black females) cannot be shown to be related to job performance, the practice is prohibited.").

**48.** The bfoq exception applies in those situations where "sex ... is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise ...." 42 U.S.C. § 2000e–2(e).

1971).[49] A defendant must show, at the very least, that there is a "positive relationship" between the rule or policy and the employer's programs. *Washington v. Davis*, 426 U.S. at 250, 96 S.Ct. at 2052. Likewise, the burden on the defendant when asserting a statutory bfoq is essentially the same as that imposed under the business necessity test. The bfoq must be related and necessary to the operation of the defendant's business. *Gunther v. Iowa State Men's Reformatory*, 612 F.2d 1079, 1087 (8th Cir.), *cert. denied*, 446 U.S. 966, 100 S.Ct. 2942, 64 L.Ed.2d 825 (1980) (no basis for bfoq defense where hiring women at prison would not undermine the administration); *Diaz v. Pan American World Airways, Inc.*, 442 F.2d 385, 388 (5th Cir.), *cert. denied*, 404 U.S. 950, 92 S.Ct. 275, 30 L.Ed.2d 267 (1971) (administrative necessity is required to satisfy bfoq).

Once it is shown that the employment policy is job related, the plaintiff may then show that the proffered explanation is not job related; rather, that it is pretext. The plaintiff may do this by showing that there are other methods which would serve the employer's interests without creating a similar discriminatory effect. *Robinson v. Lorillard Corp.*, 444 F.2d at 798.

The Girls Club has established by the evidence that its only purpose is to serve young girls between the ages of eight and eighteen and to provide these women with exposure to the greatest number of available positive options in life. The Girls Club has established that teenage pregnancy is contrary to this purpose and philosophy. The Girls Club established that it honestly believed that to permit single pregnant staff members to work with the girls would convey the impression that the Girls Club condoned pregnancy for the girls in the age group it serves. The testimony of board members Woody Bradford, Marian Andersen and Eileen Wirth made clear that the policy was not based upon a morality standard,[50] but rather, on a belief that teenage pregnancies severely limit the available opportunities for teenage girls. The Girls Club also established that the policy was just one prong of a comprehensive attack on the problem of teenage pregnancy. The Court is satisfied that the defendants have met the burden of showing that a manifest relationship exists between the Girls Club's fundamental purpose and its single pregnancy policy.

In *Harvey v. Young Women's Christian Ass'n*, 533 F.Supp. 949 (W.D.N.C.1982) an almost identical situation occurred. In that case a twenty-two year old single black female was employed by the YWCA as a program director. Approximately one and a half years after she became employed at the YWCA, the woman became pregnant. When asked by the executive director how she could continue to work with teenagers, being pregnant and unmarried, the woman responded by saying that she "could offer herself to the teenagers in her condition of unwed pregnancy, as a role model of an alternative lifestyle." *Id.* at 952. The woman was fired. Judge Potter upheld the dismissal as a legitimate business necessity. *Id.* at 956.

The plaintiff in this case seeks to distinguish the *Harvey* case by pointing out that the plaintiff in *Harvey* was espousing an alternative lifestyle, while the plaintiff in this case is not espousing anything. This representation does not comport with the evidence. On several occasions during the trial the plaintiff's attorneys asked witnesses about the possibility of the plaintiff, or other single pregnant women, becoming positive role models for the girls at the

---

**49.** There must be more than a mere rational relationship. *Washington v. Davis*, 426 U.S. 229, 247, 96 S.Ct. 2040, 2051, 48 L.Ed.2d 597 (1976); *Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726–27, 53 L.Ed.2d 786 (1977), *quoting Griggs v. Duke Power Co.*, 401 U.S. at 432, 91 S.Ct. at 854 (manifest relationship); *Donnell v. General Motors Corp.*, 576 F.2d 1292, 1299 (8th Cir.1978) (burden is heavy).

**50.** *Cf. Dolter v. Wahlert High School*, 483 F.Supp. 266, 271 (N.D.Ia.1980) where court held that Catholic high school could not rely on a bfoq defense when it fired a single pregnant teacher for immoral conduct.

Girls Club by showing them that single woman who are educated can become pregnant and can also support themselves and their children. While a single pregnant working women may, indeed, provide a good example of hard work and independence, the same person may be a negative role model with respect to the Girls Club objective of diminishing the number of teenage pregnancies. In the Girls Club setting, the pregnancy may well be viewed by teenage women as a "tacit" approval by the Girls Club of teenage pregnancies. Accordingly, the Court finds that the rule is necessary and adequately related to the core purpose of the Girls Club.[51]

■ The plaintiff attempted to meet her final burden by showing that the rule is not a business necessity, i.e., that it is merely pretextual. The thrust of the plaintiff's argument is two-fold: (1) that there are less restrictive methods of accomplishing the Girls Club's mission, and (2) there is no empirical data to support the use of the rule i.e., there is no evidence that it works. The Court has previously discussed the first point—the implementation of a less restrictive policy—and found that alternatives had been investigated and determined to be administratively impossible. *See Roller v. City of San Mateo*, 399 F.Supp. at 363. With respect to the second point, the plaintiff argues that empirical data is required to validate job relatedness. The law indicates otherwise. In *Davis v. City of Dallas*, 777 F.2d 205 (5th Cir.1985), where the relationship between a college

education and a police officer's performance was at issue, the Court stated that empirical data was not required because it is virtually impossible to measure maturity, judgment and ability. The Court did require validation of the educational requirement through an expert's opinion.

Here we have a rule made in an attempt to limit teenage pregnancies, and no data to support a finding that the rule either does, or does not, accomplish this purpose. The plaintiff's expert witness, Dr. McAdoo, testified that in her view, poor economic conditions are the greatest contributor to teenage pregnancy and the only way to resolve the problem was to deal with the economic issues, i.e., through education and training. The defendants' expert, Dr. Nancy Perry, testified that she agreed with Dr. McAdoo's assessment, but also believed that because teenagers have a need for "significant others" outside the home and are likely to develop close relationships such as those which are fostered at the Girls Club, that the role modeling rule could be (and in her opinion is) another viable way to attack the problem of teenage pregnancy.[52]

This Court believes that the policy is a legitimate attempt by a private service organization to attack a significant problem within our society. The evidence has shown that the Girls Club did not intentionally discriminate against the plaintiff and that the policy is related to the Girls Club's central purpose of fostering growth and maturity of young girls. The Court finds

---

**51.** Because the Court decides that the defendants have met their burden on the basis of business necessity, it is not necessary to determine whether the evidence would satisfy a bfoq, although presumably it would.

**52.** The plaintiff suggests that Ms. Simmons and Ms. Chambers who became pregnant after finishing high school and some college (Ms. Chambers at twenty-two and Ms. Simmons at twenty-five) could act as role models to teach the girls to delay pregnancy until after the completion of their education. The defendants' expert, Dr. Nancy Perry conceded that while this was possible, it was more likely that the girls who had come to identify themselves with various staff members would receive a different message.

Dr. Perry stated that girls between the ages of eleven and thirteen years are at a point in life when their self esteem is at its lowest, their decision-making is most impaired and their susceptibility to pressure from peers and role models is the greatest. Dr. Perry also testified that based upon her research she concluded that role modeling with a non-family member is particularly important where the role model shares certain characteristics with the observer, such as race and sex. Dr. Perry testified that identification with the role model is likely to be much stronger at this time. She concluded that the young women are likely to do what they observe without making complex distinctions.

that the rule is not a violation of Title VII, either on the basis of disparate treatment, or disparate impact. The Court emphasizes, however, that this decision is based upon the *unique* mission of the Girls Club of Omaha, the age group of the young women served, the geographic locations of the Girls Club facilities, and the comprehensive and historical methods the organization has employed in addressing the problem of teenage pregnancy. Therefore, this decision will not be applicable in many other situations which this Court could envision. The case should be dismissed.

A separate order in accordance with this Memorandum shall be entered this date.